PEOPLE ex rel. THIRD AVE. R. CO. et al. v. PUBLIC SERVICE
COMMISSION FOR FIRST DIST. et al.

(Supreme Court, Appellate Division, First Department.   June 9, 1911.)

STREET RAILROADS (§ 59*)—REORGANIZATION—ISSUE OF NEW STOCK AND
BONDS—PUBLIC SERVICE COMMISSION—CONSENT—STATUTES.

Stock Corporation Law, §§ 9–12, providing for the reorganization of
railroads, and giving purchasers on foreclosure the power to devise a
plan for readjustment of the respective interests of creditors, mortga-
gees, and stockholders and for the representation of such interest in the
bonds or stock of the corporation to be formed, and the incorporation of
such plan into the charter of the new corporation, and to issue bonds
and stock in conformity with such plan, was neither repealed by impli-
cation nor amended by Public Service Commission Law (Laws 1907, c.
429) § 55, as amended by Laws 1910, c. 480 (Consol. Laws 1910, c. 48),
conferring on the Public Service. Commission supervisory power over the
issuance of stock and bonds of railroads, and hence where a bondhold-
ers' committee purchased the assets and franchises of a street railway
company pursuant to a plan of reorganization, and organized a new cor-
poration to take over the property in accordance with the stock corpora-
tion law, the Public Service Commission had jurisdiction only to super-
vise the carrying out of the plan, and could not pass on its propriety
and refuse permission to the new corporation to issue its stock and bonds
in accordance therewith on the theory that the plan was not advanta-
geous.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 59.*]

Certiorari by the People, on the relation of Third Avenue Rail-
road Company and others, forming a bondholders' reorganization
committee, to review a determination of the Public Service Commission
for the First District, denying an application for an order authorizing
the issuance of stocks and bonds on the reorganization of the Third
Avenue Railroad Company pursuant to stock corporation law.  Re-
versed and remanded.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT,
MILLER, and DOWLING, JJ.

William D. Guthrie (John M. Bowers, Herbert J. Bickford, and
George W. Davison, on the brief), for relators.

George S. Coleman (Oliver C. Semple, on the brief), for respond-
ents.

CLARKE, J.   Certiorari to review a determination of the Public
Service Commission for the First District of the State of New York
denying an application, under section 55 of the public service commis-
sions law (chapter 429, Laws 1907), as amended by chapter 480,
Laws 1910 (Consol. Laws 1910, c. 48), for an order authorizing the
issue of stock and bonds on the reorganization of the Third Avenue
Railroad Company under and by virtue of sections 9 to 12 of the
stock corporation law (chapter 59, Consol. Laws 1909; chapter 61,
Laws 1909).

The Third Avenue Railroad was duly incorporated in October, 1853,
under chapter 140 of the Laws of 1850.   Its original capital stock
was $1,170,000.   This was increased from time to time so that prior

to May 15, 1900, it had duly issued at par for cash shares of its capital stock amounting in the aggregate to the par value of $15,995,-800, and this amount is now outstanding. An issue of $5,000,000 of first mortgage bonds was created in 1887, which were issued for cash, and are still outstanding. No default has even been made in the payment of the interest on these first mortgage bonds, and the sale under foreclosure hereafter alluded to was subject to said bonds.

In order to pay for the acquisition of stock and bonds of certain controlled companies, complete and equip electrically its own lines and those of its controlled companies, provide funds for additions and improvements, the Third Avenue Company in 1900 created an issue of bonds, known as its "consolidated four per cent. 100-year gold bonds," to the authorized amount of $50,000,000, secured by a consolidated mortgage covering all its property and franchises, including the securities by which it controlled its subsidiary companies and operated the system of through routes and transfers, namely: (1) The Union Railway Company; (2) the Forty-Second Street, Manhattanville & St. Nicholas Avenue Railway Company; (3) the Dry Dock, East Broadway & Battery Railroad Company; (4) the Kingsbridge Railroad Company; (5) the Yonkers Railroad Company; (6) the Westchester Electric Railroad Company; (7) the Southern Boulevard Railroad Company; and (8) the Tarrytown, White Plains & Mamaroneck Railway Company. The Board of Railroad Commissioners made an order whereby it granted the application and gave its consent authorizing the Third Avenue Company to execute said consolidated mortgage and to negotiate and issue bonds thereunder to the amount of $50,000,000. The Third Avenue Company actually received $36,953,174.44 for $37,560,000 of its said consolidated bonds. It is these bonds relators now represent.

The Third Avenue system comprised 272 miles of single track, of which 64 miles are underground electric trolley, 190 miles overhead trolleys, and 18 miles horse car lines. Contemporaneously with the issue of the consolidated bonds, the Third Avenue Company leased its property to the Metropolitan Street Railway Company, as authorized by statute. In September, 1907, the Metropolitan Street Railway Company and its assignee and successor, the New York City Railway Company, became insolvent, and receivers were appointed by the United States Circuit Court. It was found that the lessee had failed to keep the property of the Third Avenue system in repair or pay taxes or perform other covenants in the lease. As a result of these defaults and the insolvency of the company and its lessee, the Central Trust Company as substituted trustee, under the consolidated mortgage, filed its bill of complaint on January 3, 1908, in the United States Circuit Court, praying for the foreclosure of the mortgage and the appointment of a receiver upon the part of the holders of the consolidated bonds of the Third Avenue Company, and the court thereupon appointed Mr. Frederick W. Whitridge as receiver, who took the property and ever since has held and operated the same.

The receiver has applied the net income, being about $2,800,000, to the improvement and betterment of the property, and in addition

has issued by the authority of the United States court receiver's certificates to the amount of $3,500,000, so that since the receivership $5,300,000 has been expended out of the proceeds of the receiver's certificates and net earnings for improvements and betterments, the purchase of new rolling stock and equipment, etc. The bondholders have received no interest since July 1, 1907.

On May 17, 1909, the United States Circuit Court made and entered a decree of foreclosure and sale, adjudging that the consolidated mortgage was a valid and subsisting mortgage lien upon the property and franchises of the Third Avenue Company; that $37,560,000 face value of the consolidated bonds had been duly issued; that the sum of $40,381,173.33 was then due thereon for principal and interest; that the property and franchises should be sold in the manner in said decree specified; and that the amount so found to be due on the consolidated bonds should bear interest at the rate of 6 per cent. per annum from the date of the decree. Interest has therefore been accruing at the rate of $2,422,870 per annum from May 17, 1909; but no part thereof has been paid.

The holders of the consolidated bonds entered into a bondholders' agreement, dated November 6, 1908, appointing the individual relators as a committee and authorizing them to formulate a plan of reorganization. This committee, having presented one plan of reorganization to the Public Service Commission which was not approved, prepared the plan dated September 2, 1909, now before the court. This plan provided for the issue of the following new securities: (1) Refunding 4 per cent. bonds, $15,790,000; (2) adjustment income bonds, $22,536,000; (3) stock, $16,590,000—making a total new capitalization of $54,916,000, which would represent the following existing items of capitalization and indebtedness and the following interests in the existing corporation: (1) Consolidated 4 per cent. bonds as adjudged by United States court, $37,560,000; (2) interest accrued thereon as allowed by United States Court:

(a) To date of decree........................................... $2,821,173
(b) From date of decree to Jan. 1, 1910....................... 1,503,507
                                                              _____
                                                              $4,324,680

(3) Outstanding stock issued at par for cash, $15,995,800; (4) New cash to be contributed by stockholders, $7,200,000. Total, $65,-080,480.

It was proposed to distribute these new securities among existing bondholders and stockholders as follows: (1) To holders of consolidated bonds: (a) 15 per cent. of principal, $5,634,000, and part of defaulted interest to January 1, 1910, $3,756,000 in refunding bonds, $9,390,000; (b) 60 per cent. of principal of income bonds, $22,536,-000; (c) 25 per cent. of principal in new stock, $9,390,000; total in new securities taken at par or face value of $41,316,000. (2) To stockholders: (a) Refunding bonds, $6,400,000; (b) 45 per cent. in new stock, $7,200,000; total new capitalization divided among bondholders and stockholders, $54,916,000.

The stockholders, however, were to have no interest in such new

securities unless they paid an assessment of $7,200,000 in cash, at least $6,000,000 of which was to be expended for strictly corporate purposes and not for expenses of reorganization, namely, for receiver's certificates, taxes, etc.

The bondholders' committee filed their application and petition praying the commission to approve the proposed issues. Pending the hearings a sale under the decree became imminent, and it became necessary that a formal agreement of readjustment embodying a plan of organization should be executed if the company was to be reorganized, for the statute authorizes a plan of agreement of readjustment to be entered into at or previous to the sale by the purchasers thereat, or the persons for whom the purchase is to be made. Such agreement was entered into by the bondholders' committee on February 23, 1910. The sale of the property and franchises took place on March 1, 1910, in pursuance of the decree of the Circuit Court, subject to the existing first mortgage of $5,000,000 and all valid taxes, assessments, and liens prior to the lien of the consolidated mortgage, and the property and franchises were bid in on behalf of the bondholders' committee for the sum of $26,000,000, which was the only bid therefor. The sale was confirmed and the deed executed and delivered on April 18, 1910.

As the railroad law (chapter 481, Laws 1910 [Consol. Laws 1910, c. 49] § 151) authorizes any mortgagee of the property and franchises of a railroad corporation to purchase the same at foreclosure sale and hold and use the same for six months and convey the same to any railroad corporation, the certificate of reorganization of the new company was promptly executed and filed, and the tax required by the state of New York duly paid. The certificate provided for the capitalization which had theretofore been determined in the plan of reorganization and the agreement of readjustment. Immediately after the incorporation of the new corporation, a contract was made between it and the purchasers for the conveyance and transfer to it of all the property and franchises sold at the foreclosure sale and of all surplus moneys acquired on the reorganization, and the new corporation agreed to issue to the bondholders' committee the necessary amount of new bonds and new stock for distribution among the holders of the old bonds and stock, or to discharge the expenses of the reorganization.

The reorganized corporation was permitted to intervene in the proceeding, and subsequently the commission denied the application for leave to issue the bonds and stocks provided for in the reorganization plan submitted to it.

The main question here presented has not heretofore been considered by any court. It is: Have the statutory provisions for the reorganization of railroads, which have existed since 1853 and are now embodied in sections 9 to 12 of the stock corporation law, been repealed by implication by the provisions of the public service commission law?

The reorganization statute, which first appeared in section 2, chapter 502, of the Laws of 1853, was at first confined to railroad corpora-

tions.  After numerous amendments, it was finally transferred to the stock corporation law, where it now appears in chapter 59, Consol. Laws 1909 (chapter 61, Laws 1909), and is as follows:

"Sec. 9. Reorganization upon sale of corporate property and franchises. When the property and franchises of any domestic stock corporation shall be sold by virtue of a mortgage or deed of trust, duly executed by it, or pursuant to the judgment or decree of a court of competent jurisdiction, or by virtue of any execution issued thereon, and the purchaser, his assignee or grantee shall have acquired title to the same in the manner prescribed by law, he may associate with him any number of persons, not less than the number required by law for an incorporation for similar purposes at least two-thirds of whom shall be citizens of the United States and one shall be a resident of this state, and they may become a corporation and take and possess the property and franchises thus sold, and which were at the time of the sale possessed by the corporation whose property shall have been sold, upon making and acknowledging and filing in the offices where certificates of incorporation are required by law to be filed, a certificate in which they shall describe by name and reference to the law under which it was organized, the corporation whose property and franchises they have acquired, and the court by whose authority the sale had been made, with the date of the judgment or decree authorizing or directing the same, and a brief description of the property sold, and also the following particulars:  (1) The name of the new corporation intended to be formed by the filing of such certificate; and the place where its principal office is to be located.  (2) The maximum amount of its capital stock and the number of shares into which it is to be divided, specifying the classes thereof, whether common or preferred, and the amount of and rights pertaining to each class.  (3) The number of directors, not less nor more than the number required by law for the old corporation, who shall manage the affairs of the new corporation, and the names and post office addresses of the directors for the first year.  They may insert in such certificate any provisions relating to the new corporation, or its management, contained in any plan or agreement which may have been entered into as provided in section ten of this chapter.  Such corporation shall be vested with, and be entitled to exercise and enjoy, all the rights, privileges and franchises, which at the time of such sale belonged to, or were vested in the corporation last owning the property sold, or its receiver, and shall be subject to all the provisions, duties and liabilities imposed by law on that corporation. Any proceedings heretofore taken in substantial compliance with this section as hereby amended, and any and all incorporations based thereon are hereby ratified and confirmed.

"Sec. 10. Contents of plan or agreement.  At or previous to the sale the purchasers thereof, or the persons for whom the purchase is to be made, may enter into a plan or agreement, for or in anticipation of the readjustment of the respective interests therein of any creditors, mortgagees and stockholders, or any of them, of the corporation owning such property and franchises at the time of sale, and for the representation of such interests in the bonds or stock of the new corporation to be formed, and may therein regulate voting by the holders of the preferred and common stock at any meeting of the stockholders, and may provide for, and regulate voting by the holders, and owners of any or all of the bonds of the corporation foreclosed, or of the bonds issued or to be issued by the new corporation; and such right of voting by bondholders shall be exercised in such manner, for such period and upon such conditions, as shall be therein described.  Such plan or agreement must not be inconsistent with the laws of the state and shall be binding upon the corporation, until changed as therein provided, or as otherwise provided by law.  The new corporation when duly organized, pursuant to such plan or agreement and to the provisions of law, may issue its bonds and stock in conformity with the provisions of such plan or agreement, and may at any time within six months after its organization, compromise, settle or assume the payment of any debt, claim or liability of the former corporation upon such terms as may be lawfully approved by a majority of the agents or trustees intrusted with the carrying out of the plan or agreement of reorganiza-

tion, and may establish preferences in favor of any portion of its capital stock and may divide its stock into classes; but the capital stock of the new corporation shall not exceed in the aggregate the maximum amount of stock mentioned in the certificate of incorporation."

In Vatable v. N. Y., L. E. & W. R. Company, 96 N. Y. 53, Earl, J., said:

"A railroad company, having the right by law to mortgage its property and franchises, can confer upon the mortgagee the same interests and rights which an individual by mortgage of his property can confer. Unless some statute intervenes, the foreclosure of a railroad mortgage will cut off all the rights and interests of a railroad company, the mortgagor, in the property mortgaged, and nothing will be left for the general creditors and stockholders of the company but their interest in the surplus, if any, after satisfying the mortgage. But for many years the Legislature has attempted to protect the stockholders of railroad companies against the consequences of foreclosures of mortgages upon their property by various provisions of law more or less effectual."

He then gives the history of the reorganization statutes.

In Louisville Trust Company v. Louisville, New Albany & Chicago Railway Company, 174 U. S. 674, 19 Sup. Ct. 827, 43 L. Ed. 1130, Mr. Justice Brewer, after stating that on foreclosure only the mortgagees or their representatives can be considered as probable purchasers, said:

"We must therefore recognize the fact, for it is a fact of common knowledge, that, whatever the legal rights of the parties may be, ordinarily foreclosures of railroad mortgages mean, not the destruction of all interest of the mortgagor and a transfer to the mortgagee alone of the full title, but that such proceedings are carried on in the interests of all parties who have any rights in the mortgaged property, whether as mortgagee, creditor, or mortgagor."

The foregoing citations and our own statute sufficiently establish the accepted public policy that railroad mortgages are differentiated from ordinary real estate mortgages given by a private individual. The railroads are great public enterprises subserving a useful and necessary public need. It is in the public interest that they be not destroyed but continued and preserved. The vast sums of money required to construct and maintain them are obtained from numbers of people who purchase the stock and from others who purchase the bonds secured by mortgage upon property and franchises. A very large number of railroad corporations have gone through periods of reorganization. It is not to be doubted that the investments made in railroad securities have to a considerable extent been influenced by the knowledge that public policy expressed by statute and decision has assured to stockholders, bondholders, and creditors that, in case of foreclosure, their interests will not be entirely wiped out, but that an opportunity for reorganization is granted under the law, with the right to participate therein and to secure the preservation to some extent at least of their interests. Our own statute, cited supra, provides that, at or previous to the sale, the purchasers thereat, or the persons for whom the purchase is to be made, may enter into a plan or agreement, for or in anticipation of the readjustment of the respective interests therein of any creditors, mortgagees, and stockholders, or

any of them, of the corporation owning such property and franchises at the time of sale, and for the representation of such interests in the bonds or stock of the new corporation to be formed, and provides that such plan or agreement shall be written into and become a part of the certificate of the new corporation to be formed in pursuance of such plan, which plan therefore becomes the charter of the reorganized company. This has been the policy of the state of New York for upwards of 50 years.

The statute alluded to further provides:

"The new corporation, when duly organized, pursuant to such plan or agreement and the provisions of law, may issue its bonds and stock in conformity with the provisions of such plan or agreement."

A direct grant of power to carry out the provisions of its plan made a part of its fundamental charter. Further:

"And may at any time within six months after its organization compromise, settle or assume the payment of any debt, claim or liability of the former corporation upon such terms as may be lawfully approved by a majority of the agents or trustees entrusted with the carrying out of the plan or agreement of reorganization."

The Public Service Commission act was passed in 1907, in response to a general public sentiment to secure publicity in the affairs of public service corporations, and to guard and protect the interests of the public in their relation to such corporations. As said by Haight, J., in People ex rel. D. & H. Co. v. Stevens, 197 N. Y. 1, 90 N. E. 60:

"We understand that the paramount purpose of the enactment of the Public Service Commissions law was the protection and enforcement of the rights of the public."

It is claimed that the reorganization statute has been repealed by the Public Service Commissions act, not directly, but impliedly. Repeals by implication are not favored by the courts, and, unless the provisions of the two acts are so inconsistent that they cannot both exist side by side, a repeal of the earlier one by the later should not be declared. Especially is this true as in the case at bar, where the earlier statute expresses a settled public policy, where it provides precisely for a situation not directly covered or alluded to in the subsequent act, and where the subsequent act by amendment recognizes the continued existence of the prior act.

The reorganization statute deals with a definite thing, the readjustment of the interests of bondholders, stockholders, and creditors, upon the reorganization of a corporation upon the foreclosure of a mortgage given by it of its franchises and property. The public service act deals generally with the supervision and control of public service corporations. It contains a provision in regard to the issue of securities of such corporations. It is provided, in section 55:

"A common carrier, railroad corporation or street railroad corporation, organized or existing or hereafter incorporated under or by virtue of the laws of the state of New York, may issue stocks, bonds, notes or other evidence of indebtedness payable at periods of more than twelve months after the date thereof, when necessary for the acquisition of property, the construction, completion, extension or improvements of its facilities or for the improve-

ment or maintenance of its service or for the discharge or lawful refunding of its obligations, * * * provided and not otherwise, that there shall have been secured from the proper commission an order authorizing such issue and the amount thereof and stating the purposes to which the issue or proceeds thereof are to be applied, and that in the opinion of the commission the money, property or labor to be procured or paid for by the use of such stock, bonds, notes or other evidence of indebtedness is or has been reasonably required for the purposes specified in the order. * * *"

The commission claims that under said provision the scheme established by the reorganization statute which gives the purchasers upon the foreclosure sale the power to make a plan for the readjustment of the respective interests of creditors, mortgagees, and stockholders, and for the representation of such interests in the bonds or stock of the new corporation to be formed, and for the incorporation of such plan into the charter of the new corporation formed upon the organization and the direct grant of power to it to issue its bonds and stock in conformity with the provisions of such plan or agreement, has been entirely abrogated, and that, although foreclosure under decree of the court has been had under which the validity of the bonds issued by the old company has been established, and although a plan has been adopted and a new corporation has been formed into whose charter has been written that plan, it is for the commission to determine the details of the reorganization scheme and the amount of stock and bonds which may be issued in order to carry it out; that the wishes, views, and interests of the purchasers, the bondholders, and the stockholders, crystallized in their plan and on the faith of which the purchase was made and confirmed by the court, are absolutely of no effect whatever; that it has the power to regulate these details.

It is true in a certain sense that the Third Avenue Railway Company formed as a result of the reorganization plan and under the reorganization statute is a new corporation; but it is a new corporation based upon the former corporation, depending for its existence upon the provisions of the reorganization statute, and embodying in itself, as the very reason for its being, the reorganization agreement of the affairs of its immediate predecessor. If the statute has been repealed, then I know of no statute under which a reorganization of a railroad can be had. Certainly there are no provisions of the public service act which can be availed of. If the provisions for adopting the plan by the purchasers and making it the basis of the new charter are of no effect, then the whole scheme of reorganization is gone, because the adoption of said plan is the very gist of that scheme.

I cannot convince myself that the Legislature accidentally, indirectly, and unwittingly would so reverse and destroy the long-established public policy of the state in respect to the reorganization of railroads. The direct question here has not yet been passed upon by the courts, and there are not many cases which approach it even indirectly; but there are a few, and they are very significant. First, upon the question of repeal by implication. Village of Ft. Edward v. Hudson Valley R. Co., 192 N. Y. 139, 84 N. E. 962, was an action brought to restrain the defendants from constructing a switch on

Broadway in the village of Ft. Edward, which the defendants intended to intersect their tracks.  The Delaware & Hudson Company operated a double track steam railroad crossing Broadway at right angles.  The Hudson Valley Railway Company operated an electric street railroad in Broadway, and its tracks crossed the Delaware & Hudson at grade. It was alleged in the complaint that the two companies were engaged in building an extension of their railroads diagonally across Broadway, intersecting and connecting the tracks of the two companies without the consent of the trustees of the village and without the consent of the Public Service Commission.  Under section 12 of the railroad laws (Laws 1890, c. 565), amended by Laws 1892, c. 676, now section 22, Consol. Laws 1910, c. 49, it was provided that:

"Every railroad corporation whose road is or shall be intersected by any new railroad, shall unite with the corporation owning such new railroad in forming the necessary intersections and connections and grant the requisite facilities therefor."

Haight, J., said:

"The contention is now made that all the provisions of the statute to which we have alluded have been either repealed or superseded by the Public Service Commissions law, and we, consequently, have certified for our determination a second question, as follows: 'Was it necessary for the defendant to procure the consent of the Public Service Commission, under section 53 of the Public Service Commissions law, before making the connection proposed?' The provisions of the section, so far as they are here involved, are as follows: 'Without first having obtained the permission and approval of the proper commission no railroad corporation, street railroad corporation or common carrier shall begin the construction of a railroad or street railroad, or any extension thereof, for which prior to the time when this act becomes a law a certificate of public convenience and necessity shall have been granted by the Board of Railroad Commissioners or where prior to said time said corporation or common carrier shall not have been entitled by virtue of its compliance with the provisions of the railroad law to begin such construction; nor, except as above provided in this section, shall any such corporation or common carrier exercise any franchise or right under any provision of the Railroad Law, or of any other law, not heretofore lawfully exercised without first having obtained the permission and approval of the proper commission.'  *  *  *  Laws 1907, c. 429.  *  *  *  It must be conceded that the wording of this provision is exceedingly broad, and a determination of the legislative intent as to its scope and meaning may be involved in some uncertainty.  *  *  *  It is quite apparent that the certificate of convenience and necessity provided for in this section of the statute has no application to the act under consideration; for we have the express enactment of the Legislature making it the duty of the railroad companies to intersect their tracks for the benefit of the public, and the determination of this court in Matter of Stillwater v. M. St. Ry. Co., 171 N. Y. 589, 64 N. E. 511, 59 L. R. A. 489, in which the railroad companies were compelled to perform such duty.  It would seem, therefore, that the Legislature, by section 12 of the railroad law, had itself determined the question of convenience and necessity in such cases, and we have been unable to find any expression in the public service law indicating a legislative intent to repeal this provision of the railroad law or to invest the commissioners with the power to supersede it.  *  *  *  It may be that disputes of this character could better be determined by the Public Service Commission than they could be by the Supreme Court; but where is the statute to be found authorizing the commission to determine these questions?  We are unable to find any such authority in section 53, nor any clause therein that is repugnant to the provisions of the railroad law in this regard, or that indicates an intention to repeal or supersede the provisions alluded to."

In People ex rel. South Shore Traction Co. v. Willcox, 196 N. Y. 212, 89 N. E. 459, the Public Service Commission had determined that the construction and operation of the proposed railroad was both necessary and convenient for the public service, but had refused.its consent because it disapproved of the terms and conditions prescribed by the board of estimate and apportionment. The court held that its only jurisdiction was to determine the question of public convenience and necessity, that it had nothing to do with the terms prescribed by the local authorities, and affirmed the order of the Appellate Division directing the commission to grant the application.

In People ex rel. D. & H. Co. v. Stevens, supra, the Public Service Commission refused the application of the Delaware & Hudson Company to issue bonds for the purpose of paying certain notes issued for the purpose of acquiring the stock and securities of the Hudson Valley Railway Company and for certain coal lands, upon the ground that the purchase was an unfortunate one for the company; that it paid for the securities more than they were worth. Haight, J., said:

"For a generation or more the public has been frequently imposed upon by the issues of stocks and bonds of public service corporations for improper purposes, without actual consideration therefor, by company officers seeking to enrich themselves at the expense of innocent and confiding investors. One of the legislative purposes in the enactment of this statute was to correct this evil by enabling the commission to prevent the issue of such stock and bonds, if upon an investigation of the facts it is found that they were not for the purposes of the corporation enumerated by the statute and reasonably required therefor. We do not think that the legislation alluded to was designed to make the commissioners the financial managers of the corporation, or that it empowered them to substitute their judgment for that of the board of directors or stockholders of the corporation as to the wisdom of a transaction, but that it was designed to make the commissioners the guardians of the public to enable them to prevent the issue of stock and bonds for other than the statutory purposes. These purposes we have already enumerated in quoting the statute; the last being for the discharge or lawful refunding of its obligations. * * * It was therefore evidently the legislative intent in the enactment of this provision that the commissioners should have supervision over the issuing of long-time bonds to the extent of determining whether they were issued under and in conformity with the provisions of the statute for the purposes mentioned therein, or whether they were issued for the discharge of the actual and not the fictitious debts of the company, or whether they were issued for the refunding of its actual obligations and not for the inflation of its stocks or bonds. Beyond this it appears to us the power of the commissioners does not extend. * * * *"

In People ex rel. N. Y., N. H. & H. R. Co. v. Willcox, 200 N. Y. 423, 94 N. E. 212, where the court denied the jurisdiction of the Public Service Commission to abate a nuisance affecting the public health, although committed by a railroad company, upon the ground that such matters were within the jurisdiction of the board of health, the court, in refusing to hold that the provisions of the charter of the city of New York had been repealed or were so repugnant and inconsistent with the provisions of the public service law as to require them to yield to the latter statute as the later law, said:

"Judicial construction of a general statute should guard against interpreting its language so as to create conflict or contradiction with the provisions of an earlier and special statute if it can stand independently and with a distinct and useful purpose to accomplish. * * * The commissions were

given extensive powers, but they should not be extended by implication beyond what may be necessary for their just and reasonable execution. They are not without limits when directed against the management or the operations of railroads, and the commissions cannot enforce a provision of law unless the authority to do so can be found in the statute (citing cases); nor should they reach for dominion over matters not clearly within the statute."

It seems to me that, from these expressions of the court of last resort and the consideration of the two statutes before us, we are compelled to conclude that the reorganization statute still exists in full force and effect, unrepealed, unaltered, and unamended; that it is complete in and of itself to the extent of its direct provisions; that the relators proceeded under it and in conformity with its provisions; that the new corporation formed in conformity therewith is thereby given the express power to issue the stocks and bonds provided for in the adopted plan of reorganization; that the public service act is additional and supplementary thereto, as it is additional and supplementary to the railroad law; that an application was entirely proper to the commission; and that that commission was vested with the power to determine whether the proposed stocks and bonds were issued under and in conformity with the provisions of the statute for the purposes mentioned therein for the discharge of the actual and not the fictitious debts of the company for the refunding of its actual obligations, and whether the new corporation has been duly organized and become vested with the title to the property and franchises of the old corporation, but that it was not vested with power to pass upon the plan of reorganization.

As in the Delaware & Hudson Case, where it was held, when they had determined that the notes were valid obligations of the company, it was their duty to permit the issuance of bonds therefor. It was none of their concern as to whether or not the company had made a good or a bad bargain. So, here, the plan of reorganization had determined for what and in what manner the obligations of the company shall be issued, and it is within the jurisdiction of the commission to determine whether that plan is being carried out, not whether the plan was good or bad.

In 1910, section 54 of the public service law was amended so as to read as follows:

"Nothing herein contained shall be construed to prevent the holding of stock heretofore lawfully acquired or to prevent upon the surrender or exchange of said stock, *pursuant to a reorganization plan*, the purchase, acquisition, taking or holding of a proportionate amount of stock of *any new corporation organized to take over at foreclosure or other sale the property of any corporation whose stock has been thus surrendered or exchanged*."

This is direct legislative recognition of the continued existence of the reorganization statute.

The question which we have deemed to be controlling, and which has been heretofore discussed, renders it unnecessary to consider the many interesting points presented at bar respecting the property included by the respondents in their valuation, and respecting the basis of such valuation. The fact that we have not considered it necessary to discuss these questions is not to be taken as implying that we

consider the objections by the relators upon the matter of valuation are without merit.

The order of the commission is reversed, and the matter remitted to it, with directions to proceed as indicated in this opinion.

SCOTT, J., concurs.

INGRAHAM, P. J. I fully concur in the opinion of Mr. Justice CLARKE.

Sections 9 and 10 of the stock corporation law, to which attention has been called, provide a system by which the readjustment of the respective interests in the property and franchises of a corporation which have been sold by virtue of a mortgage or deed of trust or a judgment or decree of a court of competent jurisdiction may be carried out. They expressly allow the creditors, mortgagees, and stockholders of a corporation owning property and franchises to purchase at the foreclosure sale and to organize a corporation to carry out the objects for which the corporation was originally organized. The statute expressly gives to such creditors mortgagees, and stockholders or any of them the right to become a corporation, to make an agreement among themselves for such reorganization and readjustment, to acquire the property and franchises which have thus been sold, and to issue its bonds and stock in conformity with the provisions of the plan or agreement under which the property was purchased at the foreclosure sale. It was recognized that upon such a reorganization or readjustment new capital might be required, and so the amount of bonds or stock was not limited to the amount which had been issued by the precedessor corporation. The Legislature left it to the creditors, mortgagees, and stockholders who united in the purchase and in the plan of reorganization and readjustment to fix the amount of bonds and stock to be issued to meet the requirements of the situation. There was thus in existence a comprehensive statute to provide for one condition—the case of a corporation whose property had been sold under a decree of foreclosure or under a mortgage or deed of trust. It required entirely different treatment from the organization of a new corporation to acquire a new franchise and to acquire or construct property with which to exercise it. It was not the general condition relating to either new corporations organized to acquire a franchise, or to existing corporations exercising and operating the franchises and which would require from time to time additional money or property for the uses of such corporation, and this statute was re-enacted in 1909 after the passage of the Public Service Commissions law.

This particular subject having thus been regulated by a statute carefully framed to meet such a situation, the Public Service Commissions law was passed in 1907. The title of that act is an act to establish the Public Service Commission and prescribing their powers and duties and to provide for the regulation and control of certain public service corporations. It provided for the appointment of the public service commissioners for each of the two districts into which the state was divided, and provided that each commission should

'possess the powers and duties thereinafter specified, and also all other powers necessary or proper to enable it to carry out the purposes of the act (section 4). Article 3 of the act contains the provisions "relating to the powers of the commissions in respect to common carriers, railroads and street railroads," and subdivision 2 of section 45 provides that each commission shall have the general supervision of all common carriers, railroads, street railroads, railroad corporations, and street railroad corporations within its jurisdiction; and shall have power to and shall examine the same and keep informed as to their general condition, their capitalization, their franchises, and the manner in which their lines owned, leased, controlled, or operated are managed, conducted, and operated with respect to the adequacy, security, and accommodation afforded by their services, and their compliance with all provisions of law, orders of the commission, and charter requirements.

After giving to the Public Service Commission extensive powers in relation to the operation of common carriers, the method adopted by them in rendering the services, and the rates which they were to charge, section 53 provides that without first having obtained the permission and approval of the proper commission no railroad corpora-. tion, street railroad corporation, or common carrier should begin the construction of a railroad or street railroad or any extension thereof for which prior to the passage of the act a certificate of public convenience and necessity had 'not been granted by the Board of Railroad Commissioners, or where said corporation or common carrier should not have become entitled by virtue of its compliance with the provisions of the railroad law to begin such construction; nor, except as above provided, should any such corporation or common carrier exercise any franchise or right under any provision of the railroad law or any other law not theretofore lawfully exercised without having first obtained the permission and approval of the proper commission. This section clearly relates to the organization of a new corporation which had not acquired a franchise or had not before that time lawfully exercised a franchise. Section 54 then provides that no franchise nor any right to or under any franchise to own or operate a railroad or street railroad should be assigned, transferred, or leased, nor should any contract or agreement with reference to or affecting any such franchise or right be valid or of any force or effect whatsoever unless the assignment, transfer, lease, contract, or agreement should have been approved by the proper commission. Section 55 provides that a common carrier, railroad corporation, or street railroad corporation organized or existing or thereafter incorporated under or by virtue of the laws of the state of New York may issue stocks, bonds, notes, or other evidence of indebtedness payable at periods of more than 12 months after the date thereof when necessary for certain specified objects, provided, and not otherwise, that there shall have been secured from the proper commission an order authorizing such issue and the amount thereof, and stating that in the opinion of the commission the use of the capital to be secured by the issue of such stock, bonds, notes, or other evidence of indebtedness is reasonably required for the said purposes of the corporation.

In considering the effect of this enactment upon the existing provisions of the stock corporation law, it is important to notice that this is in form the grant of a power to corporations, rather than a restriction of power theretofore granted to them by other provisions of law. It expressly grants to any one of the named corporations power to issue bonds for specific purposes, provided, and not otherwise, that the Public Service Commission approve. As we have seen, the preceding sections regulate the organization of a corporation to acquire a new franchise or the exercise by an existing corporation of a franchise theretofore acquired by it. Section 55 gives to such corporations power to issue bonds, stock, or other obligations for certain specified purposes, provided, however, that the proper commission approve such issue and not otherwise. There is nothing in this statute which in terms or by necessary implication prohibits corporations from issuing stock and bonds for other purposes than these specified, or repeals or affects any express provision of law authorizing the reorganization of a corporation whose property has been sold under a judgment or decree of foreclosure.

That the power given to the Public Service Commission was not an arbitrary power to be exercised by it without regard to the provisions of law of the powers expressly granted to corporations has been established by the cases in the Court of Appeals referred to by Mr. Justice Clarke. Thus in Village of Ft. Edward v. Hudson Valley R. Co., 192 N. Y. 139, 84 N. E. 962, the defendants were engaged in building an extension of their railroads by intersecting and connecting the tracks of the two companies without the consent of the village and without the consent of the Public Service Commission. Such a connection was required by section 12 of the railroad law; but the claim was made that this section was either repealed or superseded by Public Service Commissions Law, § 53, to which attention has been called, which expressly provided that, without first having obtained the permission and approval of the proper commission, no railroad corporation, street or railroad corporation, or common carrier should begin the construction of any railroad or street railroad or any extension thereof. But the Court of Appeals held that, there having been an express enactment of the Legislature making it the duty of railroad companies to intersect their tracks for the benefit of the public, the Legislature had itself determined the question of convenience and necessity in such cases, and there was nothing in the Public Service Commissions law indicating a legislative intent to repeal this provision of the railroad law or to invest the commissioners with power to supersede it. Certainly the provisions of section 53 of the Public Service Commissions law are more specific than section 55 now under consideration, and yet, as the railroad law had required these railroads to make this connection, the power granted to the Public Service Commission was in subordination to that express provision of the statute, although but for that statute it is clear that the permission of the Public Service Commission would have been necessary.

In the case now before us, we have a special law providing for the reorganization of a railroad whose property has been sold under foreclosure. It expressly provides what stocks and bonds can be issued

by the reorganized corporation and authorizes the issue of stock and bonds in compliance with its provisions. Section 55 of the public service law, which authorizes a railroad corporation to issue stocks and bonds for specified purposes, providing, and not otherwise, that there shall have been secured from the proper commission an order authorizing such issue, contains no provision prohibiting a corporation from issuing bonds or stock except as therein provided if duly authorized so to do by another existing statute. I am inclined to think that, under subdivision 2 of section 45, the commission had power to supervise the carrying out of the agreement made between the bond and stockholders of the old Third Avenue Railroad Company, so that it could see that its reorganization committees and the new corporation complied with all provisions of law in the organization and transfer of the property to the new corporation; but in the exercise of that authority the Public Service Commission had no power to override sections 9 and 10 of the stock corporation law and refuse to allow securities to be issued in exact conformity with the authority conferred on the new corporation by these sections. This is in entire accordance with the other decisions of the Court of Appeals referred to by Mr. Justice CLARKE, where the same principle seems to pervade the construction given to this act. Thus in People ex rel. D. & H. Co. v. Stevens, 197 N. Y. 1, 90 N. E. 60, in speaking of the power given to the Public Service Commission by section 55, Judge Haight said:

"If upon an investigation of the facts it is found that they (stocks and bonds) were not for the purposes of the corporation enumerated by the statute and reasonably required therefor" the Commission could prevent their issue; that the Public Service Commission, however, was not empowered to substitute its judgment for that of the board of directors or stockholders of the corporation as to the wisdom of a transaction; but that it was designed to make the commissioners guardians of the public by enabling them to prevent the issue of stocks and bonds for other than the statutory purposes. "It was, therefore, evidently the legislative intent in the enactment of this provision that the commissioners should have supervision over the issuing of long-time bonds to the extent of determining whether they were issued under and in conformity with the provisions of the statute for the purposes mentioned therein, or whether they were issued for the discharge of the actual and not the fictitious debts of the company, or whether they were issued for the refunding of its actual obligations and not for the inflation of its stocks or bonds. Beyond this it appears to us that the power of the commissioners does not extend."

And in People ex rel. N. Y., N. H. & H. R. v. Willcox, 200 N. Y. 423, 94 N. E. 212, the court held that the provisions of the charter conferring jurisdiction upon the board of health were not repealed by the Public Service Commissions law.

Upon the facts as they appeared before the commission, it would seem that it was bound to approve the issue of the stocks and bonds by the new corporation in accordance with the plan of reorganization, and the power of the commission was confined to a determination of the question as to whether the proposed issue was as authorized by sections 8 and 9 of the stock corporation law and the agreement for the purchase at the sale under the judgment of foreclosure.

MILLER and DOWLING, JJ., concur.