PEOPLE ex rel. CONEY ISLAND JOCKEY CLUB v. SOHMER, State Comptroller.

(Supreme Court, Appellate Division, Third Department. March 5, 1913.)

1. TAXATION (§ 117*)—CORPORATE FRANCHISE—EXERCISE OF FRANCHISE—STATUTE—"EMPLOYED"—"EMPLOYING"—"CAPITAL"—"CAPITAL STOCK."

Tax Law (Consol. Laws 1909, c. 60) § 182, provides that every corporation doing business in the state shall pay a franchise tax for the privilege of exercising its corporate franchise, based upon the amount of its capital stock employed within the state during the preceding year. A domestic corporation incorporated in 1879 for improving the breed of horses purchased 170 acres out of its capital, and thereon maintained a racing track, a grandstand, and buildings necessary for its racing meets, and also purchased 230 acres out of its surplus and as an investment. After 1910 it held no meet, and paid no dividend for the year ending October 31, 1912, but took care of its track and maintained its organization with a principal office, a secretary who kept its books, a superintendent for its property, and rented houses on the 170-acre tract and a farm upon the 230-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

acre tract, kept an average bank balance of $15,000, borrowed money and paid salaries and rent, and made its annual report to the state comptroller, pursuant to Tax Law, § 192. *Held* that, as to the 170-acre tract, it was doing business in the state during the year ending October 31, 1912, and that as to the 230·acres it was also exercising its franchise and doing business, since in such case the capital stock must be held to be "employed" rather than invested, "employed" meaning used; that capital stock and capital were practically equivalents when considered as a basis for a franchise tax, the value of "capital stock" meaning the value of net assets, and the "capital" including the surplus, the mere fact that investment in real property was not specified in its charter as part of its business not relieving it of liability for a franchise tax.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 214; Dec. Dig. § 117.*

For other definitions, see Words and Phrases, vol. 1, pp. 954–959; vol. 8, p. 7595; vol. 1, pp. 959–967; vol. 8, p. 7595; vol. 3, pp. 2377–2380; vol. 8, p. 7649.],

2. CORPORATIONS (§ 388*)—CORPORATE POWERS—ESTOPPEL TO DENY.
   A domestic corporation choosing to have the title to real property purchased out of its surplus taken and held by the corporation is thereby estopped to claim as against the state that it has no franchise authorizing it to deal in real property.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1556–1567; Dec. Dig. § 388.*]

3. TAXATION (§ 496*)—CERTIORARI TO REVIEW ASSESSMENT—BURDEN OF PROOF.
   On certiorari to review the determination of the State Comptroller fixing the amount of a franchise tax, the corporation has the burden of showing error in the assessment.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec. Dig. § 496.*]

Certiorari by the People, on the relation of the Coney Island Jockey Club, against William Sohmer as State Comptroller to review his determination as to the amount of relator's taxes during the year ending October 31, 1912. Determination of Comptroller affirmed.

Argued before SMITH, P. J., and KELLOGG, LYON, and HOWARD, JJ.

Bowers & Sands, of New York City (Latham Reed, of New York City, of counsel), for relator.

Thomas Carmody, Atty. Gen. (Franklin Kennedy, of Albany, of counsel), for respondent.

LYON, J. The facts are practically undisputed. The relator is a domestic corporation incorporated in 1879 under chapter 269, Laws of 1854, entitled "An act for the incorporation of associations for improving the breed of horses." Its original capital stock was $100,000, which was increased on and prior to January 10, 1885, to $525,000, at which it has since remained. Of such capital stock $254,000 represented cash payments by stockholders, and $271,000 stock dividends. Prior to January 10, 1885, the relator purchased about 170 acres of land at Sheepshead Bay, in the county of Kings, upon which it laid out a race track and constructed a grandstand, stables, cottages, and other buildings necessary for its racing meetings. Between January 10, 1885, and January 1, 1907, the relator from time to time purchased.

from various owners some 20 or more additional parcels of land, constituting about 230 acres, which was not used in its racing meetings, which ·it held annually from the year 1880 to and including the year 1910. By reason of the anti-racing and anti-pool selling legislation of 1908 and 1910 the racing meetings of 1910 and of the two preceding years resulted in losses to the relator, since which time no racing meetings have been held on the Sheepshead Bay course. The relator in its annual report made to the State Comptroller for the year ending October 31, 1911, estimated its said real estate of about 400 acres to be worth $1,300,000, of which it claimed that $433,333.33 represented capital stock and $866,666.67 represented surplus earnings; that the real estate cost $531,086.25, of which $174,840.28 was paid out of capital for the purchase of the 170 acres, and the balance, $356,245.97, out of surplus for the purchase of the 230 acres. The highest price at which the stock of the relator sold during the year ending October 31, 1911, was $200 per share and the lowest price $160. The relator paid dividends during many years, but paid no dividend during the year ending October 31, 1911.

The State Comptroller assessed the relator at the rate of three-fourths of one mill upon the sum of $1,174,500, being the said reported value of its real estate less its average liabilities of $125,500. The Comptroller did not take into account in fixing the relator's assessment its New York City bonds of $559,000, which were purchased out of its profits and which it held October 31, 1911, nor its average bank balance during the preceding year of $15,000. The relator applied for a revision and resettlement of said assessment, but the State Comptroller, after hearing duly had, refused to make any reduction in the amount thereof, whereupon the relator paid the tax assessed against it of $880.88, and instituted this proceeding seeking to have said tax canceled, but, if that should be refused, to have the same reduced to $299.63 upon the ground that the capital stock of the relator employed in this state during the year ending October 31, 1911, did not exceed the sum of $399,500. The respondent in his return denied that the tax as assessed was erroneous or illegal.

[1-3] The objections raised by the relator to the assessment are that the relator was subject to no tax, as it was not exercising its franchise by carrying on its business during the year ending October 31, 1911, and that in no event should any tax be imposed as to the 230 acres, as no part of its capital stock was employed in the purchase thereof. Section 182 of the Tax Law (Consol. Laws 1909, c. 60) provides that every corporation doing business in this state shall pay a franchise tax for such privilege of exercising its corporate franchise computed upon the basis of the amount of its capital stock employed during the preceding year within this state. That the relator had not abandoned its franchise and was not dormant during such year appears from the testimony of its officers that it took care of its plant and kept its organization in force and effect, maintained its principal office as in the preceding years in the borough of Manhattan, city of New York, employed a secretary, who kept its books, employed a superintendent, who looked after its property at Sheepshead Bay, rented

its two houses on the 170-acre tract and its double house and farm of 23 acres in the 230-acre tract, kept an average bank balance of $15,000, borrowed moneys and paid salaries and rent, and made its annual report to the State Comptroller, pursuant to section 192 of the Tax Law, and exercised its franchise to the full extent desired by it. These facts were sufficient to warrant the holding of the Comptroller that the relator was doing business in this state during the year ending October 31, 1911. People ex rel. Vandervoort R. Co. v. Glynn, 194 N. Y. 387, 87 N. E. 434.

It has even been held that a domestic coporation having no office, employing no clerks or servants of any kind, paying no wages or salaries, in receipt of no income, expending no moneys, not even paying the taxes on the real estate standing in its name, having no bank account, but being merely a holding corporation of title to real estate for the convenience of the owner of the property, was nevertheless doing business and employing its capital stock within the intent of this statute, and was therefore subject to the payment of a franchise tax. People ex rel. Waclark R. Co. v. Williams, 198 N. Y. 54, 91 N. E. 266, 28 L. R. A. (N. S.) 371. Furthermore, the relator was exercising its franchise and doing business as well as employing its assets within the intent of the statute in holding the title of the 230-acre tract, which the secretary of the relator testified was bought by it for an investment, and which the record shows was worth October 31, 1911, more than double the prices paid by the relator for the parcels constituting the tract. The relator was in effect acting in the capacity of a corporation organized for the purpose of dealing in real estate. In such a case the capital stock must be held to be employed rather than invested. People ex rel. Vandervoort R. Co. v. Glynn, supra; People ex rel. Fourteenth Street Realty Co. v. Kelsey, 110 App. Div. 797, 97 N. Y. Supp. 197, affirmed 184 N. Y 572, 77 N. E. 1194. Using is employing. "From the moment when the relator began to use its money to purchase real estate for the purposes of its incorporation it employed its capital in this state within the purview of the statute." People ex rel. Fifth Avenue Building Co. v. Williams, 198 N. Y. 238, 91 N. E. 638, 139 Am. St. Rep. 809. The mere fact that carrying on the purchase and sale of real property was not specified in its articles of incorporation as a line of business to be carried on by it in no way relieves it of liability for the payment of a franchise tax. The relator was liable for the payment of a tax on its capital employed in outside and unauthorized transactions People ex rel. Tiffany v. Campbell, 144 N. Y. 166, 38 N. E. 990. In the case of People ex rel. Western Electric Co. v. Campbell, 145 N. Y. 587, 40 N. E. 239, the court said, referring to the case last cited, that the purchase and sale of goods which Tiffany & Co. did not manufacture was ultra vires, and that, while the state could intervene to prevent this usurpation of power if the public interests required it, the corporation was subject to a tax on its outside and unauthorized transactions. Were it otherwise, any corporation desiring to carry on business of a certain character could escape liability for taxation by

incorporating under a charter for carrying on a totally different business.

The relator chose to avail itself of the advantages of having the title to the 230 acres taken, held, and conveyed by a corporation, and it is therefore estopped to claim as against the state that it has no franchise authorizing it to deal in real property. Minneapolis, St. Paul & Sault Ste. Marie Railway Co. v. Oppegard, 18 N. D. 1, 118 N. W. 830. By virtue of the act under which the relator was incorporated, it had the right to purchase and hold real estate for the purposes of raising, improving, and breeding horses, as the interests and objects of the company might require. In assessing the tax the State Comptroller may have held the presumption to be that the relator in purchasing the 230 acres was acting within the authority conferred upon it and not ultra vires, or he may have held in accordance with the relator's claim that it purchased the land for the purpose of reselling it at a profit. There is nothing in the record indicating which view he took.

The burden is upon the relator to show error upon the part of the Comptroller in making the assessment. However, the relator claims that a distinction exists as to the two tracts of land, in that the 170-acre tract was paid for out of the $254,000 paid in by stockholders, while the 230-acre tract was purchased wholly out of profits accruing from the racing meetings. This distinction I consider immaterial as bearing upon the right of the State Comptroller to tax the moneys employed therein. While the statute makes the basis of taxation the amount of the capital stock employed, the words "capital stock" and "capital" are practically the equivalent of each other when considered as a basis for a franchise tax. People ex rel. Commercial Cable Co. v. Morgan, 178 N. Y. 433, 70 N. E. 967, 67 L. R. A. 960. By the value of its capital stock is meant the value of its net assets. People ex rel. Wiebusch & Hilger Co., Limited, v. Roberts, 154 N. Y. 101, 47 N. E. 980. The surplus is part of the capital and must necessarily be taken into consideration in estimating the capital. Metropolitan Securities Co. v Kelsey, 101 App. Div. 248, 91 N. Y. Supp. 711. While the relator at times declared annual dividends from its profits, it converted the greater part thereof into capital, and used and treated it as such. We have examined the authorities cited by relator as holding that the assessment made by the State Comptroller upon the relator was illegal. For the greater part these related to assessments upon foreign corporations or upon corporations which paid dividends of 6 per cent. or upwards during the year in question, or to assessments made under the statute as it previously existed, and are distinguishable from the case at bar.

In view of these facts, I think that the relator must be held to have been exercising its franchise and doing business within the state during the year in question, and employing its capital invested in the 400 acres of land within the intent of the statute. The determination of the Comptroller should therefore be confirmed with $50 costs and disbursements. All concur.