PEOPLE ex rel. LEHIGH & N. Y. R. CO. v. SOHMER, State Comptroller.
(No. 136/46.)

(Supreme Court, Appellate Division, Third Department.   September 15, 1915.)

TAXATION ⬀117—FRANCHISE TAXES—CORPORATIONS "DOING BUSINESS."

A railroad corporation, incorporated under the Stock Corporation Law (Consol. Laws, c. 59) to take and possess the property and franchises of a domestic railroad company owning and operating a railroad in the state, and which acquired the property and franchises on a foreclosure sale, and which leased the property and franchises, other than the franchise to exist as a corporation, for 999 years, and which, since the lease, has held meetings of the stockholders for election of directors, who elected officers, and which made annual capital stock reports, kept corporate accounts, and maintained corporate organization and an office in a sister state, while the railroad was operated by the lessee, did business in the state, within Tax Law (Consol. Laws, c. 60) § 182, imposing a tax for the privilege of "doing business" in the state.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 214; Dec. Dig. ⬀117.

For other definitions, see Words and Phrases, First and Second Series, Doing Business.]

Certiorari by the people of the State of New York, on the relation of the Lehigh & New York Railroad Company, against William Sohmer, as Comptroller of the State of New York, to review the determination of the Comptroller refusing to revise and readjust an assessment of corporate franchise taxes imposed on relator under Tax Law, § 182, for the year ending October 31, 1913, based on the business of the company for the year ending October 31, 1912.   Determination of Comptroller confirmed.

Argued before SMITH, P. J., and LYON, HOWARD, and WOODWARD, JJ.

Kenefick, Cooke, Mitchell & Bass, of Buffalo (E. H. Letchworth, of Buffalo, of counsel), for petitioner.

Egburt Woodbury, Atty. Gen. (Franklin Kennedy and Alfred L. Becker, both of Albany, of counsel), for respondent.

LYON, J.   The vital question involved in this proceeding is whether the Lehigh & New York Railroad Company, during the year ending October 31, 1912, was doing business in this state, within the meaning of section 182 of the Tax Law, which provided:

"For the privilege of doing business or exercising its corporate franchises in this state, every corporation, * * * doing business in this state, shall pay to the state treasurer annually, in advance, an annual tax to be computed upon the basis of the amount of its capital stock, employed during the preceding year within this state. * * *"

⬀For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The state comptroller, under the objection of the relator that it was not doing business in this state and that none of its capital stock was employed within the state, imposed a tax of three-fourths of a mill, amounting to $2,852.51, on the franchise or business of the relator, based on its total capital stock. Upon the state comptroller refusing to revise and readjust such assessment, the relator instituted this proceeding.

In order to arrive at an understanding of the facts, it will be necessary to review somewhat the circumstances attending the incorporation of the relator, its subsequent corporate action, and the provisions of the articles of incorporation, reorganization agreement, and lease:

The predecessor in ownership of the Lehigh & New York Railroad, which extends from North Fair Haven, on Lake Ontario, to a point on the dividing line between the states of New York and Pennsylvania, north of Sayre, Pa., a distance of about 115 miles, was the Southern Central Railroad Company, a domestic stock corporation, organized under chapter 140 of the Laws of 1850, entitled "An act to authorize the formation of railroad companies and regulate the same." The railroad had been operated since January 1, 1887, under a lease for 975 years, by the Lehigh Valley Railroad Company, a Pennsylvania corporation, with which system it connected at Sayre by means of a short line of track which had been operated by the lessor. The operation of the railroad having been financially unsuccessful, and the payment of interest upon its bonded indebtedness of upwards of $3,000,-000 having been for a considerable time in default, it was decided that a foreclosure of the mortgage covering its franchises and property, real and personal, was necessary. Thereupon a reorganization plan and agreement of date June 1, 1895, was adopted, under which a committee of the bondholders was appointed for the purpose of buying in the property and franchises at the foreclosure sale, if necessary, and transferring them to a company to be organized under the Stock Corporation Law, which company should lease the property as theretofore to the Lehigh Valley Railroad Company, which should continue to operate it; the latter company, as part consideration of the lease, guaranteeing the punctual payment of the principal and interest of bonds to be issued by the reorganized company, to be known as the Lehigh & New York Railroad Company, to the amount of $2,000,000.

The reorganization agreement also provided for the issuing by the new company of upwards of $4,000,000 of preferred and common stock, the object in issuing such bonds and stock being:

"To effect a reorganization without levying an assessment on the existing securities of the company, and to substitute for the existing obligations of the company: (1) New bonds guaranteed by the Lehigh Valley Railroad Company, limited in amount to such a sum that the interest thereon can, with reasonable certainty, be expected to be earned, and the bonds be available in the hands of the owners as a good marketable security. (2) Preferred stock representing past-due and unpaid coupons on consolidated bonds * * * and the reduction in principal suffered by the bondholders. * * * (3) Common stock for distribution in the proportion of 40 per cent. of their present holdings to the present holders of the common stock. * * * "

Provision was then made for the payment of the expenses of foreclosure and of other litigations, and the distribution and apportionment

of the new securities among the holders of bonds and stock. Subsequent to the execution of the reorganization agreement, and on June 28, 1895, judgment of foreclosure and sale was entered, and on August 23, 1895, said railroad property and franchises were sold under said judgment, and were purchased by the bondholders' committee in pursuance of said reorganization agreement. The members of said committee, and 12 other persons associated with them, thereupon duly executed articles of incorporation of the relator railroad company, and the same were filed in the office of the secretary of state August 24, 1895. Such articles of incorporation stated that:

"We, the undersigned, * * * desiring to form a corporation, pursuant to the provisions of the Stock Corporation Law, and to take and possess the property and franchises of a domestic stock corporation, sold as hereinafter stated, do hereby make, acknowledge, and file this certificate for that purpose."

That the property and franchises of the Southern Central Railroad Company, a domestic stock corporation organized under an act of the state of New York, entitled "An act to authorize the formation of railroad companies and regulate the same," had been sold under a decree in foreclosure and purchased by the three persons constituting the bondholders' committee, who had associated with themselves the other 12 incorporators, and that the name of the corporation to be formed should be the "Lehigh & New York Railroad Company." The articles of incorporation then recited the reorganization plan and agreement in full, preceded by the statement that such plan and agreement was entered into at or previous to such sale in anticipation of the formation of a new corporation, and that such purchase was made pursuant to it. Of the same date as the incorporation of the relator, and, as recited in said lease, as "was contemplated in and provided by said reorganization plan and agreement, that the property and franchises of the reorganized company should similarly be leased to and operated by the Lehigh Valley Railroad Company," the relator and the Lehigh Valley Railroad Company entered into a lease of said railroad property, real and personal, including any rights in the short road from the state line to Sayre, and "all franchises other than the franchise of being a corporation," for the term of 999 years, the rental to be the entire net income, the lessee agreeing to pay from the gross receipts the cost of maintenance, any franchise tax lawfully imposed, the charges for operation, and taxes and interest charges, as well as the expenses of maintaining the corporate organization of the relator, embracing the keeping of its stock and transfer books, the meetings of its stockholders and directors, and to apply any net income to the payment of dividends upon the stock of the lessor. The lease transferred to the lessee all the moneys of the lessor on hand, all its choses in action, and all its railroad supplies, to be used and applied for the benefit of and in the operation of the demised property. It provided: That the lessee should have the right to sell any real or personal property, and give all necessary deeds or other instruments to vest title in the purchaser. If additional cars or locomotives were required, the same should be provided at the expense of the lessor, and if the lessor should be unable or fail to provide the same, the lessee might

do so out of the earnings and assets of the road. That the lessor would at all times aid the lessee whenever necessary to acquire by purchase, appraisement, condemnation, or otherwise any additional lands or right of way, and that the lessor would institute any necessary condemnation proceedings, and would allow the lessee to use its name in all courts and places, and by its board of directors adopt such resolutions, and take such legal action as occasion might require, and as might be reasonably requested by the lessee. That the lessor would at any time, whenever requested by the lessee, issue bonds to discharge the said $2,000,000 of mortgage bonds. That the lessor would during the continuance of the lease maintain its corporate organization, put in force and exercise every corporate power, allowing the lessee to use its name in all proceedings, when necessary or convenient, and do each and every corporate act which the lessor might do to enable the lessee "to enjoy, avail itself of, and exercise every right, franchise, and privilege in respect to the operation, use, management, maintenance, renewal, extension, alteration, or improvement of the railroad, premises, and property hereby demised, or intended so to be, or the business there to be carried on." That in the event of default upon the part of the lessee in making payments of moneys or keeping other covenants, such default, when continued for six months, should justify the lessor in terminating the lease. The lease also provided that, in case the gross receipts should be insufficient to provide for the payments chargeable under the lease, the lessee should have the right to surrender the lease, and be relieved of further obligations in respect thereto. Since the execution of the lease the relator has held meetings of its stockholders for the election of directors, who in turn have elected officers, has had a general auditor and a secretary, has made its annual capital stock reports required by law, kept corporate accounts, maintained its corporate organization, and has had an office in the city of Philadelphia at which mail addressed to it would reach the company. Pursuant to the lease, the Lehigh Valley Railroad Company took possession of the leased property, and has since operated the same.

In view of these facts, we think the relator was properly held to have been doing business in this state within the year in question, and hence liable for the payment of the franchise tax. The cases mainly relied upon by the Attorney General as supporting the determination of the comptroller are People ex rel. Wall & Hanover Street Realty Co. v. Miller, as Comptroller, 181 N. Y. 328, 73 N. E. 1102; People ex rel. Waclark Realty Co. v. Williams, as Comptroller, 198 N. Y. 54, 91 N. E. 266, 28 L. R. A. (N. S.) 371; People ex rel. Coney Island Jockey Club v. State Comptroller, 155 App. Div. 842, 140 N. Y. Supp. 507, affirmed 210 N. Y. 549, 104 N. E. 1137; and People ex rel. Tetragon Co. v. State Comptroller, 162 App. Div. 433, 147 N. Y. Supp. 611, affirmed 213 N. Y. 702, 108 N. E. 1105. The first two cases involved the assessment of franchise taxes under the Tax Law of 1896 (chapter 908), and the latter two under the Tax Law as amended by chapter 474, Laws of 1906.

The relator claims, however, that no case is to be found in this state involving a situation similar to that in the case at bar, and that the

relator, having leased all of its property, rights, and franchises, except its franchise to be a corporation, for the period of 999 years, under which lease the lessee is conducting all the business of the relator, is clearly not doing business in this state. The relator cites the case of McCoach v. Minehill Railway Co., 228 U. S. 295, 33 Sup. Ct. 419, 57 L. Ed. 842, as being squarely in point, and as holding the nontaxability of a corporation under practically the same language of the federal Corporation Tax Act of 1909. The corresponding provision of such act was:

"Every corporation, * * * organized for profit and having a capital stock represented by shares, * * * and engaged in business in any state, * * * shall be subject to pay annually a special excise tax with respect to the carrying on or doing business by such corporation. * * *" Act Aug. 5, 1909, c. 6, § 38, 36 Stat. 112 (U. S. Comp. St. 1913, § 6300).

The Minehill Company was incorporated by an act of the Legislature of Pennsylvania for the purpose of constructing and operating a railroad, and under its charter a railroad was built and for many years operated, evidently by that company. In 1896 the Minehill Company leased its entire railroad franchises and property (other than the franchise of being a corporation) to the Philadelphia & Reading Railroad Company, for a term of 999 years, since which time the railroad has been operated by that company, and the Minehill Company has not carried on any business in connection with the operation of the railroad. The Minehill Company continued, however, to maintain its corporate existence and organization, to receive and disburse the rentals called for by the lease, to maintain a contingent fund and an office, with salaried officers and clerks, and to engage in many more activities than the relator in the case at bar. It was held by a divided court that the Minehill Company was not doing business within the meaning of the federal Corporation Tax Act, but that it was the Reading Company that was doing business as a railroad company upon the lines covered by the lease, and taxable because of it. The dissenting opinion, written by Mr. Justice Day, was concurred in by Mr. Justice Hughes and Mr. Justice Lamar.

I do not regard this decision as having any decisive bearing upon the controversy before us. The Minehill Company, as before stated, was incorporated to construct and operate a railroad, and the court held that, upon the lease becoming effective, that company was not thereafter engaged at all in the business of maintaining or operating a railroad, which was the prime object of its incorporation, but that by the lease this business had been turned over to the Reading Company, and the Minehill Company was prevented from carrying on business in respect of the maintenance and operation of the railroad so long as the lease should continue, and that in effect the Minehill Company had gone out of business. In the case at bar the relator was not incorporated for the purpose of maintaining or operating a railroad. It was incorporated as an instrumentality of reorganization of the Southern Central Railroad Company, under the provisions of the New York State Stock Corporation Law, for the purpose of taking title to the franchises and other property of that company, leasing

the same to the Lehigh Valley Railroad Company, and continuing in existence as a corporation holding the title to such franchises and property, and subject to the active and passive duties contemplated upon its incorporation. Unlike the Minehill Company, it has not leased the rights which it obtained by virtue of its incorporation and gone out of business. In fact, it derived no franchise whatever to maintain and operate a railroad by reason of its incorporation. The franchise for that purpose which it holds had belonged to the Southern Central Railroad Company, of which that company was divested by the sale in foreclosure, and of which the relator became possessed under the provisions of the Stock Corporation Law, which permitted any number of persons to purchase the property and franchises for themselves and organize a new corporation, which should possess all the rights, powers, privileges, and franchises of the prior corporation. Vatable v. N. Y., L. E. & W. R. R. Co., 96 N. Y. 50; People ex rel. Third Ave. R. Co. v. Public Service Com., 145 App. Div. 318, 130 N. Y. Supp. 97.

Neither was the relator in fact or effect the Southern Central Railroad Company, but a new and entirely different corporation, for the privilege of the organization of which the reorganized corporation was legally required to pay a tax. People ex rel. Schurz v. Cook, 110 N. Y. 443, 18 N. E. 113, affirmed 148 U. S. 397, 13 Sup. Ct. 645, 37 L. Ed. 498; Id., 154 U. S. 512, 14 Sup. Ct. 1150, 38 L. Ed. 1073. The fact that the operation of the railroad may have been unprofitable for the year in question, as seems to be indicated by the capital stock report for that year, in no way affects the liability of the relator for the payment of a franchise tax. N. Y. Terminal Co. v. Gaus, 204 N. Y. 512, 98 N. E. 11; People ex rel. Fifth Avenue Bldg. Co. v. Williams, 198 N. Y. 238, 91 N. E. 638, 139 Am. St. Rep. 809; People ex rel. Waclark Realty Co. v. Williams, 198 N. Y. 54, 91 N. E. 266, 28 L. R. A. (N. S.) 371.

The purposes for which the relator was organized are not left to conjecture, but are definitely stated in its articles of incorporation. The relator has never abandoned them, or gone out of business, but from the day of its organization it has been subserving the purposes of its creation and existence. It was formed for the purpose of doing precisely what it has done and is doing, and in view of the facts it cannot be heard to say that during the year in question it was not doing business within the fair meaning of the statute. Having sought the franchise, possessed itself of it, exercised and retained it, there seems to be no good reason why the relator should not pay the statutory tax. Plainly the determination of the state comptroller was right, and should be confirmed.

Determination of state comptroller confirmed, with $50 costs and disbursements. All concur.