(Supreme Court, Appellate Division, Third Department.  January 18, 1916.)

1. CARRIERS ☞2—PUBLIC SERVICE COMMISSION—RAILROAD LAW—STATUTES —CONSTRUCTION.

The Public Service Commissions Law (Consol. Laws, c. 48) and the Railroad Law (Consol. Laws, c. 49) having both been amended by the Legislature of 1910 in such manner as to disclose the legislative intention to harmonize the acts and render them consistent, it is the duty of the courts to construe such acts as though they were one statute, giving, if possible, the provisions of each such construction as will give some appropriate meaning and effect to every part of both, and not rendering nugatory or repealing any portion of either, keeping always in view the spirit and policy of the Legislature in making the enactments.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 4, 5; Dec. Dig. ☞2.]

2. CARRIERS ⬤➔12—MILEAGE BOOKS—MAXIMUM RATE—PUBLIC SERVICE COMMISSION—POWER TO FIX.

　　Under the provision of Public Service Commissions Law, § 49, as amended in 1910, and by Laws 1911, c. 546, empowering either commission to determine the maximum rates for reduced fare tickets by certain carriers, where that chargeable by them is not reasonably compensatory, and the provisions of section 33, subd. 4 that no provision of law shall be deemed to limit the commission's power to prescribe maximum commutation and mileage ticket fares, the Public Service Commission has power to increase the maximum rates for mileage books over the two-cent maximum prescribed by Railroad Law, § 60.

　　[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. ⬤➔12.]

3. CARRIERS ⬤➔12—REDUCED FARES—FIXING MAXIMUM—POWER OF COMMISSION.

　　The provision of the first paragraph of Public Service Commissions Law, § 49, empowering the commission to fix maximum rates generally, "notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute," does not affect the commission's power to fix maximum rates for mileage books in excess of the maximum fixed by Railroad Law, § 60, since such provision applies only to the rates mentioned in such first paragraph.

　　[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. ⬤➔12.]

4. CARRIERS ⬤➔12—MAXIMUM RATES—STATUTORY LIMIT—POWER OF COMMISSION—CONSTRUCTION OF STATUTES.

　　The effect of such statutes is not to empower the commission to raise or lower maximum rates within the statutory limit only, since such construction would leave the acts as they were before amendment, and would ignore the word "maximum" in Public Service Commissions Law, § 49, empowering the commission to fix maximum rates where the maximum chargeable is not compensatory, which power section 33 declares shall not be deemed limited by any other provision of law.

　　[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. ⬤➔12.]

　　Kellogg, P. J., and Woodward, J., dissenting.

　　Certiorari by the People, on the relation of the Ulster & Delaware Railroad Company, to the Public Service Commission of the State of New York, Second District, to review denial of relator's application for leave to issue mileage books at a greater rate than two cents per mile. Determination of commission annulled, and proceedings remitted.

　　Argued before KELLOGG, P. J., and LYON, HOWARD, WOODWARD, and COCHRANE, JJ.

　　Lewis E. Carr, of Albany, for relator.
　　Ledyard P. Hale, of Albany, for respondent.

　　COCHRANE, J. The relator, the Ulster & Delaware Railroad Company, petitioned the Public Service Commission of the Second District for authority to increase its mileage book rates in excess of two cents per mile as fixed by section 60 of the Railroad Law. The commission, after investigation, determined that the facts justified such increase, but denied the application, because of a want of statutory

power in the commission to make the necessary order. The question for determination is whether the Public Service Commissions Law gives to the commission the power which such commission has denied to itself.

[1] Section 60 of the Railroad Law, so far as germane to this question, provides that certain railroad corporations therein described, and which description includes the relator—

"shall issue mileage books having either five hundred or one thousand coupons attached thereto, entitling the holder thereof, upon complying with the conditions hereof, to travel either five hundred or one thousand miles on a line or lines of such railroad, for which the corporation may charge a sum not to exceed two cents per mile."

The Public Service Commissions Law and the Railroad Law were each revised and amended by the Legislature of 1910, and on the same day in that year became respectively chapters 480 and 481 of the Laws of 1910, and chapters 48 and 49 of the Consolidated Laws. Various provisions of the former Railroad Law deemed to be inconsistent with the Public Service Commissions Law were omitted, and the act throughout bears evidence of an attempt to harmonize it and make it consistent with the provisions of the Public Service Commissions Law. For instance, section 8 of the Railroad Law, declaring the power of railroad corporations, begins with the words:

"Subject to the limitations and requirements of this chapter and of the Public Service Commissions Law."

Section 57, dealing with the question of rates of fare, begins with the words:

"Subject to the provisions of the Public Service Commissions Law."

So that there can be no doubt that the two acts were amended and revised with reference to each other, and that such portions of the Railroad Law were eliminated as were deemed to be offensive to the provisions of the Public Service Commissions Law. The two acts are to be construed together and constitute one harmonious system, applicable to the subject concerning which both relate. Section 60 of the Railroad Law should receive the same consideration, as bearing on the question now before us, as if it were a part of the Public Service Commissions Law. Considering the circumstances of their revision and enactment, the two statutes are to be construed practically, so far as the question before us is concerned, as if they were one statute. No portion of either should be given such a construction as would repeal or render nugatory any portion of either, if such a result can reasonably be obviated. But, on the other hand, in accordance with a cardinal rule of statutory construction, every part of both statutes should be so construed, if possible, as to give some appropriate meaning and effect to every part of both statutes. And in working out such a result due regard should also be had to the spirit and policy of the Legislature in making the enactments in question.

[2] Section 49 of the Public Service Commissions Law, as amended and re-enacted in 1910, and amended by chapter 546 of the Laws of 1911, contains, among other things, this provision:

"Whenever either commission shall be of opinion, after a hearing had upon its own motion or upon a complaint * * * that the maximum rates, fares or charges, chargeable by any such common carrier, railroad or street railroad corporation are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the commission shall with due regard among other things to a reasonable average return upon the value of the property actually used in the public service and to the necessity of making reservation out of income for surplus and contingencies, determine the just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed, notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute, and shall fix the same by order to be served upon all common carriers, railroad corporations, or street railroad corporations by whom such rates, fares and charges are thereafter to be observed."

And section 33, in subdivision 4, as amended by chapter 546 of the Laws of 1911, provides as follows:

"Nothing in this section or in any other provision of law shall be deemed to limit the power of the commission to require the sale of and upon investigation prescribe reasonable and just fares as the maximum to be charged for, commutation, school or family commutation, mileage tickets over railroads or street railroads, joint interchangeable mileage tickets, round trip excursion tickets, or any other form of reduced rate passenger tickets over such railroads or street railroads."

Said chapter 546 of the Laws of 1911 also amended said section 49 by adding to it, among other things, in addition to the above quotation, the following, viz.:

"Whenever either commission shall be of the opinion, after a hearing had upon its own motion, or upon a complaint, * * * that the maximum rates, fares or charges collected or charged for any of such forms of reduced fare passenger transportation tickets by any such common carrier, railroad or street railroad corporation are insufficient to yield reasonable compensation for the service rendered and are unjust and unreasonable, * * * the commission * * * shall determine and prescribe the reasonable and just rates, fares and charges to be thereafter observed and enforced as the maximum to be charged for any of such form of ticket or tickets for the transportation of persons within the state. * * *"

Nothing like these provisions in sections 49 and 33 had ever existed before. In all the previous history of the Public Service Commissions Law the power of the commission had been confined to reducing rates, or at least to regulating rates within the statutory limitations. The law contemplated simply a reduction of rates by the commission in the interests of the public, and not an increase, even though such increase might be just and reasonable to the carriers. The effect of this new legislation was, I think, to make the commission superior to section 60 of the Railroad Law, fixing limitations on the rates of fare. Those limitations remained on the railroads, but not on the power of the commission. Sections 49 and 33 of the Public Service Commissions Law and the provisions of the Railroad Law fixing and limiting fares, as we have seen, must be construed to all intents and purposes as if they were found in one statute, and must be construed accordingly. My opinion is that section 60 of the Railroad Law establishes the maximum rate for mileage books in the absence of an order by the commission. It represents the law on the subject so long as the commission takes no action. But sections 49 and 33 of the

Public Service Commissions Law authorized the commission to make an investigation, and where it appears that the statutory rate of two cents per mile is insufficient the commission may by order increase the rate above that amount.

[3] Attention is called to the following words in the first paragraph of section 49 of the Public Service Commissions Law, viz.:

"Notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute."

And it is argued that those words indicate that the power of the commission to adjust rates must be exercised within the limitations fixed by other statutory provisions. Conceding the force of the argument, it only applies to the rates mentioned in said first paragraph of section 49, and does not apply to the reduced rates which are made the subject of the second paragraph of the first subdivision of said section 49, nor to the fourth subdivision of section 33. If the presence of those words in the first paragraph of section 49 has the force claimed for them, then the absence of them in the second paragraph of said section 49 and in the fourth subdivision of section 33 becomes more significant, and indicates the opposite effect from that which their presence in the first paragraph of section 49 is claimed to indicate.

We are dealing now with section 60 of the Railroad Law, and it cannot be claimed that said section is affected by the words last quoted from section 49 of the Public Service Commissions Law. Whether or not those words have the effect claimed for them with reference to ordinary rates of fare need not now be considered. We are now simply dealing with the question of reduced rates to which those words clearly do not apply. I think that one of the purposes of said sections 49 and 33 of the Public Service Commissions Law was to place the question of rate fixing, so far as reduced rates, at least, are concerned, within the power of the commission, and to give it jurisdiction to act without statutory limitation or restraint. Where it does not investigate or act, the carriers are limited by statute in their maximum charges. But the commission is not subject to the limitation or restraint which is placed on the carriers themselves. I know of no other interpretation which will render effective both the provisions of the Railroad Law and the provisions of sections 49 and 33 of the Public Service Commissions Law above quoted, and other similar provisions.

[4] It is argued that the meaning of the statutes is that the commission may raise or lower rates within the statutory limitations, but that the statute fixes the maximum above which the commission cannot go. To this there are two answers. First. That was the effect of the law before the revision and amendments of 1910 and 1911. The amendments of those years to sections 49 and 33 above set forth had some purpose, but they have accomplished nothing if they have simply left the statutes where they were before. They were certainly not needed in order to give the commission power to adjust rates within the existing statutory limitations and they have served no purpose whatever unless they have removed those limitations from the power of the commission. Second. The language of the amendments is not

fairly susceptible to that construction. It is the "maximum rates, fares or charges chargeable by any such common carrier," in section 49, that are made the subject of the investigation by the commission, and if the commission on such investigation finds that such "maximum rates, fares or charges" are insufficient, the commission may then determine the "reasonable and just rates, fares and charges to be thereafter observed and enforced as the maximum." And in section 33 it is the "maximum to be charged" concerning which no "other provision of law shall be deemed to limit the power of the commission." It is the "maximum" charges which are being considered in all sections. This same word is used in sections 33 and 49 of the Public Service Commissions Law and section 60 of the Railroad Law. As construed by the commission, no significance is given to the word "maximum" in section 49. If that word be eliminated from the section, it might then be construed as it has been construed by the commission. In the construction of statutes some meaning should be given as far as possible to every word and every phrase. The construction contended for makes the word "maximum" surplusage.

The determination of the commission should therefore be annulled, and the proceeding remitted to the commission for further action. All concur, except KELLOGG, P. J., and WOODWARD, J.

JOHN M. KELLOGG, P. J. (dissenting). The relator petitioned the Public Service Commission to be allowed to increase from two cents to three cents per mile the compensation it shall receive for mileage books, on the ground that the prevailing compensation is unremunerative. The commission considered that two cents per mile was unremunerative, but held that it had not the power to permit an increase. This certiorari brings up for review the power of the commission to increase the price fixed by statute for mileage books.

Evidently the Public Service Commissions Law and the Railroad Law, as brought into the Consolidated Laws and in force in 1910, are to be read together. Section 57 of the Railroad Law provides: "Subject to the provisions of the Public Service Commissions Law" railroad corporations may fix and collect the rates mentioned therein. Section 60 requires every railroad, with certain exceptions, to issue mileage books, with 500 or 1,000 coupons attached, entitling the holder to travel either 500 or 1,000 miles, for which the company may charge not to exceed two cents per mile, and upon the presentation of the book the holder shall be entitled to travel for a number of miles, equal to the number of coupons detached by the conductor. It is significant that this section, unlike section 57, does not contain a clause that it is "subject to the provisions of the Public Service Commissions Law." The absence of such a provision suggests the inference that, while one of the sections is subject to that law, the other is not. In 1910 we find in force the following provisions of the Public Service Commissions Law, of interest here:

Section 32 prohibited any common carrier from giving any undue or unreasonable advantage to any person, locality, or to any particular description of traffic in any respect whatsoever. Section 33 has four

subdivisions. The first prohibits transportation until the schedules of rates have been filed and published, and prohibits a carrier from receiving any greater, less, or different compensation than the rates so scheduled, and provides that no privilege or facility shall be extended to any shipper or person, except such as are regularly and uniformly extended to all persons and corporations under like circumstances. The second subdivision prohibits the issuing of free passes or free tickets, except to employés and certain persons mentioned therein. Subdivision 3 provides that nothing in that chapter shall be construed to prohibit the interchange of free or reduced transportation between common carriers for officers, agents, employés, attorneys, and others, or to the employés of the carrier, or to prohibit the carrier from transporting persons or property incidental to or connected with contracts for construction, and to the extent that such free or reduced transportation is mentioned in the contract. It then continues:

"Provided further, that nothing in this chapter shall prevent the issuance of mileage, excursion, school or family commutation, or commutation passenger tickets, or half-fare tickets for the transportation of children under twelve years of age, or * * * joint interchangeable mileage tickets, with special privileges as to the amount of free baggage that may be carried under mileage tickets of one thousand miles or more. But before any common carrier subject to the provision of this chapter shall issue any such mileage, excursion, school or family commutation, commutation, half-fare, * * * or joint interchangeable mileage ticket with special privilege as aforesaid, it shall file with the commission copies of the tariffs of rates, fares or charges on which such tickets are to be based, together with the specifications of the amount of free baggage permitted to be carried under such joint interchangeable mileage ticket, in the same manner as common carriers are required to do with regard to other rates by this chapter."

Subdivision 4 provides that nothing in that section, or in any other provision of law, shall be deemed to limit the power of the commission to require the sale of and upon investigation prescribe reasonable and just fares as the maximum to be charged for commutation, school or family commutation, or mileage tickets over railroads or street railroads, except for a continuous ride wholly within the limits of a city other than a city of the first class, or joint interchangeable mileage tickets or round-trip excursion tickets over such railroads.

It will be noted that subdivisions 3 and 4 are saving clauses, or limitations upon the general language of the statute, and are not express grants of power. The proviso above quoted is not new in the statute, but is substantially a re-enactment of the existing law. Subdivision 4, however, is entirely new. Prior to 1910 the carrier might issue the class of tickets referred to if it liked, and fix its own price below the regular rate. By the addition of subdivision 4 an intention was shown to allow the commission to require such tickets to issue and to regulate their price. No express grant of such power was given. There was reason to believe, until the amendment of 1911, hereinafter referred to, that the issue of these reduced fare tickets mentioned was entirely optional with the carrier, and the price entirely within its discretion. Even after the amendment of 1911 it was contended that, a regular rate having been fixed, the Legislature had not the power to require a reduced rate for service upon the same line and between the

same places covered by the regular rate. In People ex rel. N. Y., N. H. & H. R. R. Co. v. Public Service Commission, 159 App. Div. 531, 145 N. Y. Supp. 503, we held the Legislature had such power, which decision was affirmed on the opinion of this court in 215 N. Y. 689, 109 N. E. 1089. It is evident that the mileage tickets mentioned in subdivisions 3 and 4 are not the mileage books which the Railroad Law required carriers to issue. These subdivisions permit tickets to issue which otherwise would not issue, but do not relate to mileage books, which under the law must be issued. The mileage ticket, the excursion ticket, the commutation ticket, and the other tickets referred to, are special reduced fare tickets.

By section 49, entitled "Rates and Service to be Fixed by the Commission," power was given to the commission, in the first sentence thereof, to regulate rates generally. After providing that, if the commission found a rate unjust "or in any wise in violation of any provision of law," it continues:

"Or that the maximum rates, fares or charges chargeable by any such common carrier, railroad or street railroad corporation, are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the commission shall, with due regard among other things to a reasonable average return upon capital actually expended, and to the necessity of making reservation out of income for surplus and contingencies," fix the maximum rate "notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute."

It seemed to me that the last paragraph quoted was so inconsistent with the remainder of the sentence that it should be disregarded as surplusage, or that we should construe it as if the word "different" or "another" was found in place of the word "higher." The word "higher" appeared to be so out of keeping with the rest of the sentence quoted that it did not seem to carry with it the actual legislative intent. But, upon a reargument of this case, counsel have given the history of this part of the section and the manner in which it was formed while passing through the Legislature, and it now appears that the legislative intent was that the paragraph should have just the effect which the words ordinarily imply, and that by the use of the paragraph quoted it intended to permit the reduction of a statutory rate, but not to allow the commission to increase a rate which the Legislature had itself fixed. When this section first appeared before the Legislature we find the paragraph to read:

"Notwithstanding that another or different rate, fare or charge has been authorized by statute."

The words "another or different" were stricken out, and the word "higher" substituted, for a purpose, and the discussions before the committees make it clear that the purpose was to prevent the increase of a statutory rate. This section did not grant to the commission any power to regulate rates for reduced fare tickets, and the existence of such power could only be inferred from the proviso contained in the fourth subdivision of section 33. It is evident that in 1910 the commission had no power to increase a statutory rate and that the statute made it clear that such power was denied.

As we understand, it is contended that the power to increase a statutory rate and the mileage book rate results from the amendments to sections 33 and 49 of chapter 546 of the Laws of 1911. That chapter amended section 33 by inserting in the proviso we have quoted from subdivision 3 the words "or any other form of reduced rate passenger tickets," and by adding to subdivision 4 the words "or any other form of reduced rate tickets over such railroads or street railroads." The other changes are immaterial here. The amendments to these subdivisions make it clear that those provisions relate only to reduced fare tickets, and such as subdivision 3 impliedly permits a railroad to issue for less than the rate which would otherwise be lawful.

The important amendment to section 49 is the addition of a second paragraph to the first subdivision thereof, expressly giving to the commission the power to regulate these reduced fare tickets and the charges therefor. It provides that, if the commission finds that the rate for any such tickets is unreasonable "or in any wise in violation of any provision of law," it may prescribe a rate. It contains substantially the same language with reference to these reduced fares that we find in the first sentence of the section, which gives the power to regulate regular rates, except the words "notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute" are omitted. The omission of these words is substantially made the basis of the claim that the commission may increase the compensation to be paid for a mileage book, although the first sentence of the section, relating to rates generally, was re-enacted in the amendment and indicates clearly the legislative intent that the statutory rate may be lowered but not increased. The sentence relating to this class of tickets is speaking of a ticket which is selling for less than the regular fare, and it is manifest that, if the ticket sold for the regular price or more, it would not be a reduced rate ticket, and would have no force in this paragraph. It would seem strange if the statute, in speaking of a reduced rate ticket, should have in it a clause that the rate might be changed, although a higher rate was fixed by law. The fact of the issuance of such a ticket presupposes that it is issued for less than the regular or full rate. The first sentence relates to the ordinary rates, and an ordinary statutory rate cannot be increased. The second sentence relates to certain reduced fare tickets, and it is evident that such rates may be increased or lowered, as they have existence only where the carrier or the commission have fixed them at a reduced rate. When the rate equals the general rate it ceases to be a reduced fare, and clearly falls within the first sentence of section 49 as to the regulation of general rates.

So far as we are concerned with the amendments of 1911 referred to, they seem to have been made for no other purpose than to make it plain that the provision of subdivisions 3 and 4 of section 33 relate, not only to the reduced fare tickets therein mentioned, but to any other form of reduced rate passenger tickets of like nature, and to make it plain that the Legislature gave to the commission full power to require such tickets to issue and to regulate the rates therefor. The service originally was at the option of the carrier; now it is subject

to the direction of the Public Service Commission. Clearly it was not intended that the rate for these reduced fare tickets could be greater in any event than the full fare tickets. The absence of the clause omitted is therefore fully accounted for; its presence in speaking, of reduced fare tickets would be meaningless. We must not be misled by the use of the expression in the statute, "maximum rates." The statute itself prescribes that no rate shall be charged unless it is contained in a schedule filed with the commission, and that no carrier shall charge, demand, collect, or receive a greater, or less, or different, compensation than stated in the schedule. For ordinary service there is, therefore, but one rate, and it seems a misnomer to call it a maximum rate, because no less rate can be charged. Neither does the expression seem to mark the difference between a general rate and a reduced fare rate, because a reduced fare rate is scheduled, and for the special service for which it is allowed the schedule must be strictly observed. Therefore it would seem that every rate which a carrier may charge for a service is the maximum rate for that service. If the service is special, the rate is special; but it is 'the only rate for that service. The amendment was evidently intended to conform to section 33 as amended by the same act, and to bring the similar provisions of that section into section 49, which is entitled "Rates and Services to be Fixed by the Commission," so that section 49 should contain the law upon that subject. The first sentence in the section relates to the regulation of general rates; the remainder of the first subdivision of the section, as amended, relates to reduced rate tickets. Neither of them relate to mileage books.

There is nothing in the above amendments to show a change in the public policy upon the question of the mileage book, or upon the question of permitting the commission to increase rates fixed by statute. The acts which it is contended show such change evidently were not intended for any such purpose, and if given that effect it must result solely from a forced construction of the language employed, and not from the fact that a deliberate intent to change the act is apparent. The amendments referred to relate to reduced fare tickets, by which for special occasions, for special purposes, and for a special kind of travel a rate may be fixed and changed by the commission, but does not relate to the mileage book prescribed by legislative act, in which the Legislature refrained from saying, as it said in section 57 of the Railroad Law, that it is subject to the provisions of the Public Service Commissions Law. We are not dealing with the question of public policy, whether the commission should be given the power to change the rate for a mileage book as prescribed by section 60 of the Railroad Law. That is a question for the Legislature, and not for the courts. The court is powerless to change the law; it can only determine whether the Legislature has changed it. In my opinion it has not.

The appellant contends that the Mileage Book Law as applied to it is unremunerative, and that the commission has so found, and that therefore the law violates its constitutional rights. But we have seen that the Legislature has not committed to the commission any power to increase the price of mileage books, and has refrained from giving it

power to increase a statutory rate. When it determines, as it properly did, that it had not power to increase the cost of the mileage book, or to increase a statutory rate, it decided the only question before it, and was without power to determine whether the Legislature had or had not fixed a fair price for mileage books. The conclusion of the commission that the price is unreasonable cannot be considered by us; it is only important as showing that the petition of the applicant was denied solely for want of power. The power of the commission is the only question here. If the appellant wishes to attack the Mileage Book Laws as invalid so far as it applies to it, the remedy is elsewhere. The commission had no power to pass upon the constitutionality of a statute relating to a subject not committed to its charge. We cannot at this time consider whether the Mileage Book Law is oppressive to the relator or not.

I favor confirmation of the order, with $50 costs and disbursements.

WOODWARD, J. (dissenting). I fully concur in the conclusion of Mr. Justice COCHRANE that the Railroad Law and the Public Service Commissions Law are both in full force and effect; that the legislative intent to bring them into harmony is apparent all through the legislation, and that "the two statutes are to be construed practically, so far as the question before us is concerned, as if they were one statute." I go further and agree with him that—

"no portion of either should be given such a construction as would repeal or render nugatory any portion of either, if such a result can reasonably be obviated," and that "in accordance with a cardinal rule of statutory construction every part of both statutes should be so construed, if possible, as to give some appropriate meaning and effect to every part of both statutes."

But at this point I diverge from his reasoning and his conclusions, for I am confronted at the outset, in the application of these propositions of law, with the fact that the construction which my learned Brother of the bench places upon the two statutes does operate to "repeal or render nugatory" an important portion of section 60 of the Railroad Law, and fails to give "some appropriate meaning and effect to every part of both statutes."

While laying down the broad propositions quoted above, the learned justice writing entirely fails to place before us all of the provisions of section 60 of the Railroad Law, but contents himself with so much of it as he declares to be germane to the question before us. But if we are to give effect to all parts of the act we must know the language of at least the section which we are called upon to construe, and this provides that:

"Every railroad corporation operating a railroad in this state, the line or lines of which are more than one hundred miles in length, and which is authorized by law to charge a maximum fare of more than two cents per mile, and not more than three cents per mile, and which does charge a maximum fare of more than two cents per mile, shall issue mileage books having either five hundred or one thousand coupons attached thereto, entitling the holder thereof, upon complying with the conditions thereof, to travel either five hundred or one thousand miles on the line or lines of such railroad, for which the corporation may charge a sum not exceeding two cents per mile. Such mileage books shall be kept for sale by such corporation at every ticket

office of such corporation in any incorporated village or city, and any of such books shall be issued immediately upon application therefor. * * *. Such mileage book shall entitle the holder thereof to the same rights and privileges in respect to the transportation of person and property to which the highest class ticket issued by such corporation would entitle him. Such mileage book shall be good until all coupons attached thereto have been used. Any railroad corporation which shall refuse to issue a mileage book, as provided by this section, or in violation hereof, to accept such mileage book for transportation, shall forfeit fifty dollars, to be recovered by the party to whom such refusal is made; but no action can be maintained therefor unless commenced within one year after the cause of action accrues."

We both agree that the Legislature has not intended to repeal section 60 of the Railroad Law, that all parts of that act must be given effect in the construction of the statute, and that "no portion of either should be given such a construction as would repeal or render nugatory any portion of either, if such a result can be reasonably avoided"; and the question arises as to what are we going to do with the concluding provisions of section 60 of the Railroad Law, which provides a penalty of $50, to be recovered by the person who is refused one of these mileage books, if the Public Service Commission is permitted to dispense with them and permit the railroad corporation to issue a different book, or to withdraw them entirely? If section 60 is not repealed, then this provision for a penalty is not repealed. It is the law of this state that any railroad company, coming within the classification fixed by section 60 of the Railroad Law, which refuses to provide the mileage book therein described shall be subject to a penalty of $50, and we both agree that it is our duty to give effect to all parts of the statute, and to consider all its parts in giving construction to its true intent and meaning. It is not yet suggested that the Public Service Commission has been vested with all the legislative powers of the state, and the rule is well settled that a surrender of the power of the Legislature in any matter of public concern must never be presumed from uncertain or equivocal expressions. Louisville & Nashville R. R. v. Kentucky, 161 U. S. 677, 685, 16 Sup. Ct. 714, 40 L. Ed. 849, and authorities there cited; Railroad Co. v. Hecht, 95 U. S. 168, 170, 24 L. Ed. 423. If this part of the statute is in force—if the Legislature deliberately permitted it to remain in its revision of the statutes—it must be presumed that it was intended to have effect. Whatever powers have been delegated to the Public Service Commission to regulate rates, no power has been given it to repeal penal provisions, and the fact that the Legislature has retained section 60 of the Railroad Law in its language as existing at the time of the revision, seems to me practically conclusive that it intended to have the provision enforced.

The object in providing a penalty, which may be collected by the person who is aggrieved, is to insure the enforcement of the law. Where a new right is created, or a new duty imposed by statute, if a remedy be given by the same statute for its violation or nonperformance, the remedy given is exclusive (City of Rochester v. Campbell, 123 N. Y. 405, 414, 25 N. E. 937, 10 L. R. A. 393, 20 Am. St. Rep. 760), and the provision for enforcement is as much a part of the enactment as the right or duty created. The right and the remedy, so long as they are created by the same statute, are of equal sanction;

the one cannot exist without the other, except through the interposition of the legislative will. There is the right to a mileage book, such as is provided by the section quoted, and there is the remedy to the person who is denied this right. The one would not have been enacted without the other; they are parts of the same thing—the right and the remedy are one. The legislative intent is clearly to give an absolute right to the individual to purchase a mileage book upon the particular class of railroad described, which is to comply with the provisions of the statute, and the failure to supply such a mileage book, or to honor it, subjects the offending railroad to a penalty. It certainly could not have been the intention of the Legislature to provide for the abrogation of this right and to maintain the penalty, but we look in vain in the Public Service Commissions Law for any suggestion that that body is empowered to change the public policy of the state, or to abrogate its statutes. We conclude, therefore, that if effect is to be given to all of the provisions of section 60 of the Railroad Law, in arriving at the intent of the Legislature, we must conclude that it intended that this section, applying, as it does, to a particular class or railroads, was to remain in full force and effect. This being so, it is our duty to find out what powers were intended to be vested in the Public Service Commission in reference to the regulation of rates of transportation.

Before going to this phase of the case, however, it seems proper to go into the examination of the Railroad Law a little more critically, and to understand the state of the law at the time the Public Service Commissions Law and the Railroad Law were revised. Prior to 1895 (chapter 1027, Laws of 1895) there was no provision for mileage books in the statute law of this state. The only existing provisions of law in respect to the compensation which railroads were permitted to charge were those found in chapter 565 of the Laws of 1890, that of taking and conveying "persons and property on its railroad * * * and to receive compensation therefor" (section 4, subd. 7), and that "every railway corporation may fix and collect the following rates of fare as compensation, to be paid for transporting any passenger and his ordinary baggage, for each mile or fraction of a mile"; and this is followed by various classifications of railroads, and concludes with the provision, "in all other cases, three cents" (section 37). This was accompanied by a special provision that it should not affect the rate of two cents per mile upon the New York Central Railroad, and section 38 provided that:

"The Legislature may, when any such railroad shall be opened for use, from time to time, alter or reduce the rate of freight, fare or other profits upon such road; but the same shall not, without the consent of the corporation, be so reduced as to produce with such profits less than ten per centum per annum on the capital actually expended, nor unless, upon an examination of the amounts received and expended, to be made by the board of railroad commissioners, they shall ascertain that the net income derived by the corporation from all sources, for the year then last past, shall have exceeded an annual income of ten per cent. upon the capital of the corporation actually expended."

Here was an early recognition of the rule, since largely applied, that the Legislature in granting a franchise is entering into a contract

relation with the corporation, and that it cannot arbitrarily so change that contract as to deprive the corporation of a fair return upon its investment; in other words, that the act of reducing fares is one involving judicial determination of the reasonableness of such reduction. This was the state of the law when chapter 1027 of the Laws of 1895 was enacted, following the lead of Michigan, in which it was provided that:

"Every railroad corporation operating a railroad in this state, the line or lines of which are more than one hundred miles in length, and which is authorized by law to charge a maximum fare of more than two cents per mile and not more than three cents per mile, shall issue mileage books entitling the holder thereof to travel one thousand miles on the line or lines of such railroad, for which the corporation may charge a sum not to exceed two cents per mile. Any railroad corporation which shall refuse to issue a mileage book as provided by this section, or, in violation thereof, to accept such mileage book for transportation, shall forfeit fifty dollars, to be recovered by the party to which such refusal was made," etc.

This was subsequently amended by chapter 577 of the Laws of 1898, and as thus amended is now contained in section 60 of the Railroad Law. But the original act in 1895 and the amendment of 1898 were independent statutes; they have merely been adopted into the Railroad Law under the comparatively recent revision of the statutes, and in taking them over from the domain of independent statutes the Legislature must be deemed to have intended to preserve the policy of the state as it had been fixed by these statutes and the adjudications of the courts in relation thereto.

In 1891 the Legislature of Michigan enacted a mileage book law similar to the present statute in this state, and the Lake Shore & Michigan Southern Railroad Company having refused to sell a mileage book to one Smith the latter applied for a writ of mandamus to compel the corporation to obey the law. He succeeded in all of the state courts, over the contention of the railroad company that it was protected by a contract with the state and that the issuing of the mileage book at the reduced rate was taking its property without due process of law, and the case was taken by writ of error to the Supreme Court of the United States, where the court declined to determine the question of the contract relation, but held the act invalid as a taking of the property of the plaintiff in error without due process of law. After reviewing the authorities, in connection with the facts, the court say:

"The question is presented in this case whether the Legislature of a state, having the power to fix maximum rates and charges for the transportation of persons and property by railroad companies, with the limitations above stated, and having power to alter, amend, or repeal their charters, within certain limitations, has also the right, after having fixed a maximum rate for the transportation of passengers, to still further regulate their affairs, and to discriminate and make an exception in favor of certain persons, and give to them a right of transportation for a less sum than the general rate provided by law. It is said that the power to create this exception is included in the greater power to fix rates generally; that, having the right to establish maximum rates, it therefore has power to lower those rates in certain cases in favor of certain individuals, while maintaining them or permitting them to be maintained at a higher rate in all other cases. * * * It does not seem to us that this claim is well founded. We cannot regard this exceptional legislation as the exercise of a lesser right which is included in the greater

one to fix by statute maximum rates for railroad companies. The latter is a power to make a general rule applicable to all cases and without discrimination in favor of or against any individual. It is the power to declare a general law upon the subject of rates beyond which the company cannot go, but within which it is at liberty to conduct its work in such a manner as may seem to it best suited for its prosperity and success. This is a very different power from that exercised in the passage of this statute. * * * If the maximum rates are too high in the judgment of the Legislature it may lower them, provided they do not make them unreasonably low as that term is understood in the law; but it cannot enact a law making maximum rates, and then proceed to make exceptions to it in favor of such persons or classes as in the legislative judgment or caprice may seem proper. * * * But it may be said that, as the Legislature would have the power to reduce the maximum charges for all to the same rate at which it provides for the purchase of the 1,000-mile ticket, the company cannot be harmed or its property taken without due process of law when the Legislature only reduces the rates in favor of a few, instead of in favor of all. It does not appear that the Legislature would have any right to make such an alteration. To do so might involve a reduction of rates to a point insufficient for the earning of the amount of remuneration to which a company is legally entitled under the decisions of this court. In that case reduction would be illegal. * * * Prima facie, the maximum rates as fixed by the Legislature are reasonable. This, of course, applies to rates actually fixed by that body. * * * In holding this legislation a violation of that part of the Constitution of the United States which forbids the taking of property without due process of law and requires the equal protection of the laws, we are not, as we have stated, thereby interfering with the power of the Legislature over railroads as corporations or common carriers, to so legislate as to fix maximum rates, to prevent extortion or undue charges, and to promote the safety, health, convenience, or proper protection of the public. We say this particular piece of legislation does not partake of the character of legislation fairly or reasonably necessary to attain any of these objects, and that it does violate the federal Constitution as above stated."

In Beardsley v. N. Y., L. E. & W. R. R. Co., 162 N. Y. 230, 232, 56 N. E. 488, the plaintiff brought an action to recover the penalty prescribed by chapter 1027 of the Laws of 1895, for failure to provide a mileage book, and the court followed the decision of the United States Supreme Court, as it was bound to do, and the judgment of the lower court in favor of the plaintiff was reversed and the complaint dismissed. In the case of Purdy v. Erie Railroad Co., 162 N. Y. 42, 46, 56 N. E. 508, 48 L. R. A. 669, it appeared from the record that the Erie Railroad Company was incorporated on the 14th day of November, 1895, and that in the year 1896 it refused to issue a mileage book to one Purdy, who thereupon brought an action to recover the penalty of $50 prescribed by chapter 1027 of the Laws of 1895, and the court, in upholding a recovery, pointed out that a statute which is unconstitutional so far as it purports to act retroactively, may be upheld as to future cases, and after referring to the point determined in the Lake Shore & Michigan Southern Case, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858, says:

"We know of no reason, however, why a railroad company may not agree upon sufficient consideration, to surrender or transfer any specific pecuniary right. The right to contract as to property is one of the inherent rights of a citizen, of which he cannot be deprived. * * * The same liberty of contract exists in the grant of charters by the Legislature. Therefore, a regulation as to the price of transportation, which would be an illegal exaction when sought to be imposed on existing corporations solely by legislative fiat,

may, in the case of future corporations, be the mere performance of the obligation of a contract. The authority to construct and operate a railroad is not the natural right of a citizen, but a franchise proceeding from the favor or grant of the state. As a condition of such grant, the Legislature might require the company to transport passengers at any prescribed rate of fare; equally, it may require that certain classes of passengers be transported at a particular rate of fare, or that any passenger, under certain circumstances, and on compliance with certain requirements, be transported at such rate."

It was held in this case that the railroad corporation, having been organized subsequent to the enactment of chapter 1027 of the Laws of 1895, the plaintiff was entitled to recover under the provisions of the act. The same rule was recognized and followed in Minor v. Erie Railroad Co., 171 N. Y. 566, 64 N. E. 454, and in Parish v. Ulster & Delaware R. R. Co., 192 N. Y. 353, 356, 85 N. E. 153, so late as the year 1908, while the work of statutory revision was under way.

With all of these matters fresh in the minds of the revisers and of the members of the Legislature, the Railroad Law, revised and remodeled in many respects, was made to include the act of 1895, as amended by chapter 577 of the Laws of 1898, without change. It has no relation to railroads in existence prior to 1895, unless in the case of consolidation of such railroads under new acts of incorporation (Parish v. Ulster & Delaware R. R. Co., supra), but as to railroad corporations created since that time it has entered into the charter as a part of the contract; the Ulster & Delaware Railroad Company has stipulated as a part of the consideration for its franchises that it will issue the mileage books provided for in section 60 of the Railroad Law, and it is now asking to have the Public Service Commission of the Second District relieve it of this part of its contract.

And right here it may be well to consider the suggestion, so often made in connection with this case, that the right given to the Public Service Commission to reduce rates should carry with it the right to increase rates above the maximum established by law, and, because it should have this power, that the Legislature must be deemed to have granted it, even though the language used is not clear. But where does this lead us? No one doubts that the Legislature might, in its discretion, advance the maximum rates for mileage books to 2½ or to 3 cents per mile; but it does not follow that it could by its mere fiat reduce the price of 1,000-mile books to $15, or 1½ cents per mile. It has contracted with every railroad corporation of the class of the relator from 1895 that it should have its charter in consideration of its agreement, among other things, that it would furnish mileage books at 2 cents per mile, and the Legislature has no power to change that rate without the consent of the Delaware & Ulster Railroad Company, unless upon a judicial investigation such rate should be found too high. The right on the part of the Legislature to increase the rates for mileage does not carry with it the right to violate its contract with the Delaware & Ulster Railroad Company, and the right on the part of the Public Service Commission to regulate existing rates, by increasing or decreasing the same within certain limitations fixed by the maximum prescribed by the Legislature and by judicial investigation into their reasonableness, does not carry with it the right to violate the

contract which the Delaware & Ulster Railroad Company has made with the people of the state of New York that it will furnish mileage books at the rate of 2 cents per mile. The relator could not have secured its franchise to operate its railroad properties, except upon the condition that it agreed to furnish these mileage books; the mileage book law entered into the contract and became a part of it, and until the Legislature, as the agent of the people, shall amend or repeal the statute, there is no power which can dissolve the contract.

It takes two persons or corporations to make a contract, and it takes the same parties to modify or annul it, and section 60 of the Railroad Law cannot remain in force as an enactment of the Legislature, and at the same time be taken out of the existing contract with the Delaware & Ulster Railroad Company. So long as it exists as a law, and the prevailing opinion insists that it is still the law, it cannot cease to be a part of the consideration of the contract existing between the people of this state and the Delaware & Ulster Railroad Company. The Legislature, as the agent of the people, and the Delaware & Ulster Railroad Company were the contracting parties, and the Legislature alone has the reserved power to modify or repeal the laws which entered into that contract. That is a legislative function, and could not properly be delegated, and it is never to be presumed that the Legislature has attempted to abrogate its powers. What has been done— and a careful reading of the statute will disclose the truth—is to vest in the Public Service Commission, not a legislative, but a judicial, function in relation to railroad rates. Nothing that the Public Service Commission is authorized to do can amount to a contract; it is merely authorized to reach a determination of what is reasonable under an existing state of facts, and to make an order governing the matter for such time as the conditions shall remain substantially unchanged, but it is not permitted to interfere in any manner with the contracts of the railroad with the people of this state, nor can any justification be found for contending that it may set aside the maximum rates established by the Legislature, and which have become a part of the contract with existing railroad corporations.

Having conclusively established, as it seems to me, that section 60 of the Railroad Law is unrepealed and an integral part of the law of the state, controlling in so far as it relates to railroads of the class to which the relator belongs, let us see what has actually been done by the Legislature in enacting the contemporary act, the Public Service Commissions Law. By what process of reasoning men justify resorting to negative statutes for the purpose of finding positive powers I am unable to determine, but I find various references to section 33 of the Public Service Commissions Law in this and other cases, and, if we failed to examine the section we might conclude that it had some bearing upon the question here presented. But an examination must certainly dissipate such a theory. The first subdivision provides that:

"No common carrier subject to the provisions of this chapter shall after the first day of November, nineteen hundred and seven, engage or participate in the transportation of passengers or property, between points within the state, until its schedules of rates, fares and charges shall have been filed and published in accordance with the provisions of this chapter. No common

carrier shall charge, demand, collect or receive a greater or less or different compensation for transportation of passengers or property, or for any service in connection therewith, than the rates, fares and charges applicable to such transportation as specified in its schedules filed and in effect at that time; nor shall any such carrier refund or remit in any manner or by any device any portion of the rates, fares, or charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property except such as are regularly and uniformly extended to all persons and corporations under like circumstances."

Clearly there is no power here delegated to the Public Service Commission; it is purely and simply a limitation upon common carriers, which may be railroads or other common carriers. The next subdivision is equally without power. It provides that:

"No common carrier subject to the provisions of this chapter shall, directly or indirectly, issue or give any free ticket, free pass or free transportation for passengers or property between points within this state," with a long list of exceptions.

The third subdivision provides further that:

"Nothing in this chapter shall be construed to prohibit the interchange of free or reduced transportation between common carriers of or for their officers," etc., and a lot of matters of no possible bearing upon the powers of the commission, and then follows the proviso, "that nothing in this chapter shall prevent the issuance of mileage, excursion, school or family commutation, commutation passenger tickets, half-fare tickets for the transportation of children under twelve years of age, or any other form of reduced rate passenger tickets, or joint interchangeable mileage tickets, with special privileges as to the amount of free baggage that may be carried under mileage tickets of one thousand miles or more. But before any common carrier subject to the provisions of this chapter shall issue any such mileage, excursion, school or family commutation, commutation, half-fare, or any other form of reduced rate passenger tickets, or joint interchangeable mileage ticket, with special privileges as aforesaid, it shall file with the commission copies of the tariffs of rates, fares or charges on which such tickets are to be based," etc.

It is in reference to these inhibitions and limitations upon common carriers, found in section 33 of the Public Service Commissions Law, that subdivision 4 of the section provides that:

"Nothing in this section or in any other provision of law shall be deemed to limit the power of the commission to require the sale of, and upon investigation prescribe reasonable and just fares as the maximum to be charged for, commutation, school or family commutation, mileage tickets over railroads or street railroads, joint interchangeable mileage tickets, round trip excursion tickets, or any other form of reduced rate passenger tickets over such railroads or street railroads; provided that all special round trip excursion tickets, the sale of which is limited to less than thirty days, except round trip excursion tickets to the state fair and return during the holding thereof, shall be deemed exempt from such regulation by the commission."

If we now turn to section 57 of the Railroad Law, we shall find that it is provided that:

"Subject to the provisions of the Public Service Commissions Law, every railroad corporation may fix and collect the following rates of fare as compensation to be paid for transporting any passenger and his baggage, not exceeding one hundred and fifty pounds in weight, for each mile or fraction of a mile"

—and that there has been no re-enactment of the provisions of section 38 of chapter 565 of the Laws of 1890, which permitted the Leg-

islature, from time to time, to "alter or reduce the rate of freight, fare or other profits upon such road." The result of this modification of the provision of section 57 of the old Railroad Law, which provided that every railroad corporation "may fix and collect the following rates of fare as compensation," etc., is to take away from the railroad corporations the right to fix the rates arbitrarily, and to place that power in the hands of the commission, and, of course, it is no longer necessary that the Legislature shall reserve to itself the power to "alter or reduce the rate of freight, fare or other profits," for that power is vested in the commission, with authority to enter into an inquiry to determine whether the rates are proper.

It should be remembered, in this connection, that the Consolidated Laws of 1909 were not designed as new enactments, but as a revision of the laws; the statutory revision commission was not to create new laws, but to bring together and harmonize old laws in a comprehensive scheme, and when the Public Service Commissions Law and the Railroad Law underwent this revision we are not to look for any substantial changes in the law, but merely for a harmonious adjustment of the two statutes. We should not, therefore, expect to find in the Public Service Commissions Law any larger powers of control over the fixing of rates than the Legislature had previously reserved to itself. The original Railroad Law provided that the railroad corporations might fix and collect certain definite rates, and the power to so fix carried with it, of course, the authority to charge less rates, if in the judgment of the corporation such rates were best suited to its purposes (Lake Shore & Michigan Southern R. R. Co., 173 U. S. 684, 691, 19 Sup. Ct. 565, 43 L. Ed. 858), and it then reserved to itself the power to "alter or reduce the rate," to regulate the rates fixed by the corporations, and it cannot be presumed that the Legislature, in abrogating this reserved power to itself, has intended to confer a larger power upon the Public Service Commission. Under the provisions of chapter 565 of the Laws of 1890, as well as in the present Railroad Law, no rates were fixed for freight charges. These, in the very nature of things, could not be fixed by statute to govern classifications, difference in conditions, length of haul, grades to be overcome, etc. It was provided (section 4, subdivisions 7 and 8) that the corporation, "subject to the limitations and requirements of this chapter," should have power "to take and convey persons and property on its railroad * * * and to receive compensation therefor," and "to regulate the time and manner in which passengers and property shall be transported, and the compensation to be paid therefor"; and then section 37 provided the maximum rates which might be charged for passenger fares under various conditions, and section 38 provided that the Legislature might from time to time "alter or reduce the rate of freight, fare or other profits upon such road," with the consent of the corporation, or upon an examination by the board of railroad commissioners, when it was found that the net income for the year then last past had exceeded 10 per cent. upon the capital of the corporation actually expended.

It is to be noted that, except for the provisions of section 38 of the old Railroad Law, there was no limitation upon the power of railroad corporations to fix and regulate the compensation to be paid for transporting freight, except the general rule of the common law that such rates must be reasonable (Village of Saratoga Springs v. Saratoga Gas Co., 191 N. Y. 123, 146, 83 N. E. 693, 18 L. R. A. [N. S.] 713), and this simply meant that so long as 'the corporation did not exceed 10 per cent. upon its capital it might impose any rates or conditions upon the shipper which the latter would stand without invoking the aid of the courts to protect himself against unreasonable exactions.    The railroad corporation could, of course, depend in a large majority of cases upon the acquiescence of the shipper to any rates or conditions prescribed, and it was the abuse of this power, both in the matter of rates and in the facilities afforded shippers, which aroused public sentiment and produced in 1907 the Public Service Commissions Law. People ex rel. Third Ave. R. Co. v. Public Service Commission, 145 App. Div. 318, 329, 130 N. Y. Supp. 97, affirmed 203 N. Y. 299, 96 N. E. 1011; People ex rel. B. L., H. & P. Co. v. Stevens, 203 N. Y. 7, 96 N. E. 114.    One of the paramount purposes of the Legislature in establishing the Public Service Commissions was to protect and enforce the rights of the public, and the statute should be construed with that in view.    People ex rel. B. L., H. & P. Co. v. Stevens, supra.    This is made clear by the provisions of section 26 of the act, which provides that:

"Every corporation, person or common carrier, performing a service designated in the previous section, shall furnish, with respect thereto, such service and facilities as shall be safe and adequate and in all respects just and reasonable.    All charges made or demanded by any such corporation, person or common carrier, for the transportation of passengers or property, or for any service rendered or to be rendered in connection therewith, as defined in section 2 of this chapter, shall be just and reasonable and *not more than allowed by law or by order of the commission having jurisdiction and made as authorized by this chapter.*    Every unjust or unreasonable charge made or demanded for any such service or transportation of passengers or property or in connection therewith *or in excess of that allowed by law or by order of the commission is prohibited.*"

The only rates "allowed by law" are the maximum rates fixed for passenger transportation, while the rates for freight and other service are provided for by sections 27, 28, 29, 30, 31, and 32, and then follows section 33, which we have already considered, and which clearly does not give any power to the commission to allow an increase of passenger rates beyond those fixed by statute, for it deals only with the various forms of "reduced rate passenger tickets," which, of course, are those passenger tickets which are reduced below the rates "allowed by law," and which are dealt with in the second paragraph of section 49 of the Public Service Commissions Law.

We come, then, to the question whether, in the construction of section 49 of the Public Service Commissions Law, we are called upon to so interpret it as to "repeal or render nugatory any portion" of section 60 of the Railroad Law, for this is the rule we have agreed is to be applied, and that:

"Every part of both statutes should be so construed if possible as to give some appropriate meaning and effect to every part of both statutes."

If we have reasoned to any purpose, we have established that section 60 of the Railroad Law, originally an independent statute, constitutes the condition of the franchise of every railroad organized or reorganized since 1895 and coming within the classification fixed by the act; that the rate "allowed by law" for mileage books upon such railroads is two cents per mile, and that the penal provision, which has been repeatedly adjudicated and held to be in effect as to all railroads of the class which have come into being as corporations since 1895, is constitutional and valid, constituting a vital part of the section, and can have no basis of operation if the commission is authorized to and actually does change the rate "allowed by law." In other words, an increase in the rate for mileage books must either operate to repeal this penal provision of the act, or it must give a cause of action against the corporation where the corporation is itself acting within the law, and we agree that:

"No portion of either should be given such a construction as would repeal or render nugatory any portion of either if such a result can reasonably be obviated," but that "every part of both statutes should be so construed if possible as to give some appropriate meaning and effect to every part of both statutes."

Keeping in mind, then, that the Legislature has established maximum rates for passenger fares under various classifications in section 57 of the Railroad Law, and has permitted the railroad corporations, subject to the provisions of the Public Service Commissions Law and "this chapter," to "regulate the time and manner in which passengers and property shall be transported, and the compensation to be paid therefor," we are prepared to read section 49 of the Public Service Commissions Law, and to understand that it simply carries out the spirit of section 38 of the old Railroad Law, and permits the Public Service Commission to determine upon the reasonableness of freight charges, facilities of transportation, and to regulate passenger rates within the limits "allowed by law." This is clearly giving "some appropriate meaning and effect to every part of both statutes," and it should not, therefore, be extended to the mutilation of section 60 of the Railroad Law which, as we have already seen, enters into the consideration of the contract with the state for the franchises enjoyed by these railroads of the class of the relator.

Section 49 provides:

"Whenever either commission shall be of opinion, after a hearing had upon its own motion or upon a complaint, that the rates, fares or charges demanded, exacted, charged or collected by any common carrier, railroad corporation or street railroad corporation subject to its jurisdiction for the transportation of *persons or property* within the state, or that the regulations or practices of such common carrier, railroad corporation or street railroad corporation affecting such rates are unjust, unreasonable, unjustly discriminatory or unduly preferential, *or in any wise in violation of any provision of law,* or that the maximum rates, fares or charges, chargeable by any such common carrier, railroad or street railroad corporation are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the commission shall with due regard, *among other things,* to a reasonable average

return upon the value of the property actually used in the public service and to the necessity of making reservation out of income for surplus and contingencies, determine the just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed, notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute, and shall fix the same by order to be served upon all common carriers, railroad corporations or street railroad corporations by whom such rates, fares and charges are hereafter to be observed."

To understand this thoroughly we must remember that section 28 of the same act requires each railroad company to file with the commission schedules "showing the rates, fares and charges for the transportation of passengers and property within the state between each point upon its route and all other points thereon," and that section 29 provides that these rates shall not be changed without the approval of the commission, while section 33 provides that no common carrier subject to the provisions of this act shall "engage or participate in the transportation of passengers or property, between points within the state, until its schedules of rates, fares and charges shall have been filed and published in accordance with the provisions of this chapter." The same section further provides that:

"No common carrier shall charge, demand, collect or receive *a greater or less or different compensation* for transportation of passengers or property, or for any service in connection therewith, than the rates, fares and charges applicable to such transportation as specified in its schedules filed and in effect at the time; nor shall any such carrier refund or remit in any manner or by any device any part of the rates, fares or charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property except such as are regularly and uniformly extended to all persons and corporations under like circumstances."

Here we find the key to the use of the word "maximum" which seems so important to my Brother of the bench. The schedule of rates having been once fixed and determined, the corporation is forbidden to "demand, collect or receive a greater or less or different compensation for transportation of passengers or property, or for any service in connection therewith, than the rates, fares and charges applicable" as fixed by the schedules. The power to "regulate the time and manner in which passengers and property shall be transported, and the compensation to be paid therefor" is limited by this provision; the corporation is no longer permitted to vary its rates or its facilities at its caprice, but must conform to the published rates, which have been fixed either by statute or the action of the corporation with the approval of the commission, and it is in respect to the schedules thus required to be made and enforced impartially that section 49 provides that where the commission, upon its own motion, or upon complaint—

"shall be of opinion, after a hearing had," that "the rates, fares or charges demanded, exacted, charged or collected * * * or that the maximum rates, fares or charges chargeable by any such common carrier, railroad or street railroad corporation are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the commission shall, with due regard among other things to a reasonable average return upon the value of the property actually used in the public service and to the necessity of making reservation out of income for surplus and contingencies, determine

the just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed, notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute," etc.

In other words, the commission, taking into consideration all of the factors entering into the problem of reasonable compensation may make the maximum rates, fares, or charges less than they appear in the schedules at the time on file, notwithstanding the fact that the Legislature has by statute fixed a higher maximum; but it nowhere provides that, where the Legislature has fixed a maximum rate, fare, or charge, the commission may step in and increase that maximum figure. This is exactly the power which the Legislature reserved to itself under the provisions of section 38 of the old Railroad Law. The maximum rate fixed by the Legislature is prima facie a reasonable rate for the particular service (Lake Shore & Michigan Southern R. R. v. Smith, 173 U. S. 684, 695, 19 Sup. Ct. 565, 43 L. Ed. 858), and if the maximum rates are too high, in the judgment of the Legislature, it may lower them, provided they do not make them unreasonably low as that term is understood in the law (Lake Shore Case, supra). This power may be delegated to the Public Service Commission, and this is the power which has been delegated; but there is no language which would justify us in holding that the Legislature has attempted to delegate the power to increase the maximum rates for passenger service, either by the use of tickets or mileage books.

What the Legislature has done is to definitely fix the rates for mileage books, as well as the maximum rates for passenger tickets upon various classes of railroads, and no power has been given to change those rates upward. If there has been, then the New York Central Railroad may claim an increase in its passenger rates, notwithstanding that the statute specially provides that:

"This chapter shall not be construed to allow any rate of fare for way passengers greater than two cents per mile to be charged or taken over the track or tracks of the railroad known as the New York Central Railroad Company," etc. Railroad Law, § 57, subd. 5.

While it has fixed absolutely the rate for mileage books, and has fixed a maximum rate for railroads generally in carrying passengers, it has not put it out of the power of the commission to provide just and reasonable compensation for the service which the railroad performs to the public. The commission, taking into consideration all of the facts, among them that railroads of a certain class must issue mileage books at a fixed rate per mile, which books afford all of the privileges of the highest grade of tickets issued by the company, say, if it is of the opinion after an investigation that—

"the maximum rates, fares or charges chargeable by any such common carrier, railroad or street railroad corporation are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable," having "due regard among other things to a reasonable average return upon the value of the property actually used in the public service and to the necessity of making reservation out of income for surplus and contingencies, determine the

just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed," etc.

This does not require a change in the Mileage Book Law, nor in the law governing the New York Central Railroad in so far as its passenger rates are concerned; it simply empowers the commission to adjust the freight and other service charges to the static rates established for these railroads by law, and to permit them to earn a "reasonable average return upon the value of the property actually used in the public service." A reasonable average return does not mean a reasonable return upon the carrying of the particular passengers who happen to hold mileage books, but "a reasonable average return upon the value of the property actually used in the public service and to the necessity of making reservation out of income for surplus or contingencies." If, for instance, the mileage book passenger is carried at a loss, this condition of the franchise amounts to an overhead charge upon the resources of the company. The commission is not authorized to change the Mileage Book Law, but it is authorized to consider the entire earnings of the railroad, subject to this and other overhead charges, and to increase the freight and other service charges, if necessary, to a point where the average earnings of all the departments of the business will result in a "reasonable average return upon the value of the property actually used in the public service," etc. In other words it comports with the public policy of the state to require passengers to be carried at figures which may not afford a measure of profit—even at a loss. It grants its franchise to these railroads upon this condition that they will carry passengers at certain fixed rates, or not in excess of such rates, and this it has a perfect right to do. Purdy v. Erie Railroad Co., 162 N. Y. 42, 49, 56 N. E. 508, 48 L. R. A. 669.

But as a common carrier at common law is entitled to reasonable compensation for the service rendered, and it is always within the province of the state to be just, it is provided that the Public Service Commission may, upon a view of the whole subject, so adjust the freight and other charges as to afford a reasonable return upon the property actually made use of in the public service. It has long been contended that the New York Central & Hudson River Railroad Company was carrying passengers at a loss, and many efforts have been made to induce the Legislature to change the rate of fare, but never with success. Under the provisions of section 38 of the old Railroad Law, as well as under the common law, it has always been permitted to earn a fair average return upon the value of the property used in the public service, and no one looks for it to surrender its charter and franchises because one particular portion of its business is conducted at or below the cost of the service. The same principle is found in the popular magazines, many of which furnish their publications to their readers at less than the cost of the blank paper, depending for their revenue upon the advertising rates which they are enabled to command by reason of their large circulations; and it is no uncommon thing to find many business enterprises which lose money upon some feature, only to be compensated out of others.

It may be that much of the volume of freight and other charges is due to the extensive travel induced by relatively low-priced passenger fares, and the railroads may be actually benefited by this policy on the part of the state.

It may be suggested that this conclusion runs counter to the language of Mr. Justice Kellogg in People ex rel. v. N. Y., N. H. & H. R. R. Co., 159 App. Div. 531, 540, 145 N. Y. Supp. 503, that the "regulation of rates means that each patron of the road shall pay an adequate compensation for the service he received, and shall not be required to pay for the service furnished to another." The question before the court in that case was in reference to a railroad "differently situated from any other railroad serving New York City," to quote from the opinion. The relator, under a contract, was called upon to pay a certain portion of each fare collected from local passengers, the net result being that the commuter was being carried at a less price than it actually cost the company to transport him, and it was in reference to this situation, and the suggestion that the burden of this contract price for local passengers should be distributed upon the entire passenger business of the relator, that the court used the language above quoted. It was not considering the broad question of the power of the Public Service Commission to adjust the average income of railroads, but was considering whether the New York, New Haven & Hartford Railroad Company, under a contract different from that of any other railroad, could add a charge, based on a contract which considered only local traffic, to the operating expenses of the railroad as a whole, thus increasing the burden upon the general traffic for the benefit of the commuter, whose transportation is subject to the old contract under which the relator was enabled to come into the heart of New York City with its trains. Under the contract, originally designed to cover the normal transportation over the New York & Harlem Railroad, before the days of the commuter, the relator is obliged to give such a rate per passenger that it actually carries the commuters at a loss, although the commuter himself is paying a rate equal to that of other railroads under like circumstances, and the question before the court was whether this contract, entirely inconsistent with modern traffic conditions, could be considered as a legitimate charge against the operating expenses of the railroad, and thus to increase the rates for passengers between New York and Boston and intermediate stations, and it was suggested, though not necessary to the decision, that "each patron of the road shall pay an adequate compensation for the service rendered to another," and to illustrate the point the court say:

"It is difficult to see why a passenger traveling from New Haven to Boston should pay more than the service is worth because the commuters from Mt. Vernon to New York are carried by the company at an actual loss."

But in this same connection it was said that:

"It is not necessary, however, to determine that all of the tollage and terminal charges should be borne by the passenger service."

And that is the point which I make, that the average rates of all the charges shall afford a reasonable compensation to the railroad. In the

case which we are considering, the state has required as a condition of granting a franchise that the relator shall furnish mileage books at two cents per mile. This is a condition which the state has a right to impose on its corporations (Purdy v. Erie Railroad Co., 162 N. Y. 42, 56 N. E. 508, 48 L. R. A. 669), and this unquestionably became a limitation upon the income of the passenger department, which the railroad company had a right to make up by increased charges upon freight and other passenger service to the point where the average income of the railroad would result in a reasonable compensation for the service rendered to the public, and an incidental expression, designed to illustrate a different question, should not be laid hold of to interfere with a just and proper construction of the law as it relates to the facts of the case presented on this review.

This view of the proper construction of the Public Service Commissions Law, and of the Railroad Law, gives effect to every provision of both enactments; it allows an intelligent application of every section and every clause and every word in both acts; and, as it conforms to the rule asserted by my Brother of the bench, I am constrained to dissent from his conclusion, and to hold that the determination of the Public Service Commission that it was without jurisdiction to change the Mileage Book Law is in harmony with the law and should be sustained.